**Erasmo MUNOZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–99–0214–CR.**

Court of Appeals of Texas,
Amarillo.

Aug. 14, 2000.

Paul E. Mansur, Denver City, for appellant.

G. Dwayne Pruitt, Dist. Atty., Brownfield, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

BRIAN QUINN, Justice.

Erasmo Munoz (appellant) appeals his conviction for engaging in organized crime. Through three points of error, he ques-

tions the legal and factual sufficiency of the evidence underlying his conviction, the trial court's refusal to grant him a continuance, and its failure to charge the jury on a lesser included offense. We reverse.

## Background

The State indicted appellant for engaging in organized crime. The accusation involved appellant's alleged collaboration with Concepcion Mendoza and Maria Marin (the woman with whom Mendoza lived) regarding the sale of approximately 27 pounds of marijuana. The record discloses that Mendoza had previously sold one pound of marijuana to an undercover officer named Arredondo in September of 1997. The contraband was obtained by Mendoza from an individual named Angel Lamar. In October of 1997, the officer again approached Mendoza about acquiring more marijuana, however, he sought more than a pound this time. Rather, the parties discussed the acquisition of approximately 30 pounds of the controlled substance. Furthermore, the negotiations occurred not only between Mendoza and the officer, but eventually included Marin.

Given the inquiry from Arredondo, Mendoza approached appellant to determine where such a quantum of the drug could be obtained. Whether Mendoza had ever acquired drugs from appellant before goes unmentioned in the record. Nevertheless, appellant told Mendoza "I will let you know in 15 days." Several days passed before Mendoza again approached appellant. At that time, appellant stated "that it was nothing yet" and "wait a little longer."

On October 30, 1997, appellant obtained the marijuana and informed Mendoza of same. Mendoza then contacted Arredondo. Later that day, Arredondo arrived at the home of Mendoza and Marin to discuss the sale. Initially, Mendoza was not there. Nevertheless, Marin told the officer about the marijuana and its location. During this conversation, the parties discussed price, and Marin also mentioned that ap-

pellant was the supplier. This representation about appellant being the potential supplier had also been mentioned to Arredondo by Mendoza. Yet, nothing of record indicates that Arredondo himself ever conversed or dealt with appellant prior to this transaction.

Eventually, Mendoza arrived home and undertook the negotiations. He contacted appellant to determine the logistics of the sale. When he did so, he was told that the drug was in another town (O'Donnell) and it had not yet arrived. This information was then relayed to Arredondo. After waiting a while, Arredondo told Mendoza to contact him if and when he secured the contraband and then Arredondo left.

Shortly before midnight on the 30th, appellant contacted Mendoza and told him that the drug had arrived from O'Donnell. Mendoza then called Arredondo, who agreed to meet Mendoza at a gas station. By the time the two met at the station, Mendoza had already visited with appellant and obtained a pound of the marijuana to show to Arredondo; appellant had refused to allow Mendoza to take the entire quantity without paying for it. When Arredondo arrived at the station, he inspected the sample and agreed to go with Mendoza to acquire the rest. The two then drove, in separate vehicles, to appellant's home. There, they found appellant, Viola Munoz, Carlos Munoz, Marin, a juvenile, and two other Hispanics that neither Mendoza nor Arredondo recognized. While the others watched, appellant gestured towards a plastic cooler and said that approximately 27 pounds of marijuana was in it. Arredondo opened the cooler, concluded that the substance was marijuana, and informed appellant that he had to return to his car to get the money.

As Arredondo left the house, other officers who arrived at the scene were signaled to begin the raid. A group of officers then entered the home, secured its occupants (save for the two unknown Hispanics who purportedly escaped) and con-

ducted a search. As a result of the search, the police found the cooler with the marijuana, a handgun, a set of scales in Mendoza's car, a brown paper bag containing "two bundles" of marijuana in a back bedroom, and a small notebook containing names and phone numbers in appellant's pocket. Though the notebook had "some similarities to" the type of book "used by people in the narcotics business," no one could testify that it was such a book. Nor could anyone testify that the names and phone numbers contained in it were those of people in any way involved with controlled substances.[1]

### Point One—Legal and Factual Sufficiency of the Evidence

Through his first point, appellant argues that the evidence is both legally and factually insufficient to establish that he "intended to be part of a combination" formed to pursue criminal activities. We agree and sustain the point.

### Standard of Review

The standards of review applicable to claims of legal and factual insufficiency are well-settled and need not be repeated. Instead, we cite the litigants to *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560, 573 (1979) and *Clewis v. State,* 922 S.W.2d 126, 129 (Tex. Crim.App.1996)(en banc) for explanations of same.

■ Next, to secure a conviction for engaging in organized crime, the State had to prove that the accused 1) "with intent to establish, maintain, or participate in a combination or in the profits of a combination" and 2) committed or conspired to commit one or more predicate offenses. TEX. PENAL CODE ANN. § 71.02(a) (Vernon Supp.2000).[2] Additionally, the word "com-

bination" appearing under the first prong of section 71.02(a) has been defined as meaning "three or more persons who collaborate in carrying on criminal activities, although ... 1) [the] participants may not know each other's identity; 2) membership in the combination may change from time to time; and 3) [the] participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations." *Id.* at § 71.01(a)(1), (2), & (3). In turn, this definition has been interpreted by our Court of Criminal Appeals as obligating the state to prove not only that the *accused intended* to establish, maintain, or participate in a group of three or more but also that the members of the *group intended* to work together in a continuing course of criminal activities. *Dowdle v. State,* 11 S.W.3d 233, 235–36 (Tex.Crim.App.2000); *Nguyen v. State,* 1 S.W.3d 694, 697 (Tex.Crim.App. 1999).

■ Given the foregoing definition and interpretation, two observations are of particular importance. First, section 71.02(a) requires proof of two different *mens rea,* i.e., that of the accused and that of the group. Not only must the defendant intend to participate, maintain, or establish a group, but also the group must intend to work together in a continuing course of criminal activity. *Dowdle v. State, supra.* In other words, there must be evidence of an agreement to act together in this continuing course of activity. *Barber v. State,* 764 S.W.2d 232, 235 (Tex.Crim.App.1988).

■ Second, the continuing course of criminal activity referred to must encompass more than one crime, *Nguyen v. State,* 1 S.W.3d at 697, or criminal episode. *Ross v. State,* 9 S.W.3d 878, 882 (Tex. App.—Austin 2000, no pet.). That is, it is not enough to show that the members came together only to commit one offense. *Id.* For instance, the facts in *Nguyen* were

---

**1.** At least two phone numbers were to the Texas National Guard and the National Guard.

**2.** The predicate offenses itemized include but are not limited to the unlawful manufacture, delivery, dispensation, or distribution of a controlled substance. TEX. PENAL CODE ANN. § 71.02(a)(5) (Vernon's Supp.2000).

held insufficient to illustrate a continuing course of illegal conduct because the group involved simply desired to avenge an insult. *Nguyen v. State,* 1 S.W.3d at 696–97. Once the insult was avenged, the reason for and existence of the group dissipated.

Similarly, in *Ross,* the boys forming the group were overcome with road rage and because of that sought to retaliate against the female who purportedly cut them off while driving. *Ross v. State,* 9 S.W.3d at 880. And, although in pursuing their goal they committed several criminal offenses, nothing indicated that once they achieved their goal the members intended to continue their illegal conduct. *Id.* Given this, the *Ross* court felt compelled to hold that the evidence, at most, simply depicted that the members temporarily organized to commit one criminal episode which did not satisfy the elements of section 71.02(a).

■ That the life of the group is of limited duration, however, is not alone determinative. For instance, in *Mast v. State,* 8 S.W.3d 366 (Tex.App.—El Paso 1999, no pet.) the facts illustrate that the group existed to sell tools that had been stolen. While nothing in the opinion suggests that the group intended to continue operations once the tools were sold, the court nevertheless found that the requisite intent to pursue a course of continuing criminal activity existed. This was so given the evidence that showed the group engaged in at least two criminal transactions during its brief life. *Id.* at 370. The fact that the actual duration of the band may be brief does not immunize one from prosecution as long as the evidence reveals the requisite *mens rea* and agreement.

■ Finally, as has been recognized for years, *mens rea* is a rather difficult element to prove via direct evidence. Seldom does the accused deign to facilitate his conviction by admitting to having the state of mind required to support conviction. Thus, circumstantial evidence may be used to prove it. *Morales v. State,* 828 S.W.2d 261, 263 (Tex.App.—Amarillo 1992,

pet. granted), *aff'd,* 853 S.W.2d 583 (Tex. Crim.App.1993). It may also be used to prove the existence of an agreement to collaborate in continuing criminal activities. *Mast v. State,* 8 S.W.3d at 369.

### *Application of Standard*

■ The predicate offense at bar involves the distribution or delivery of a controlled substance. TEX. PENAL CODE ANN. § 71.02(a)(5). Thus, the State was obligated to prove, beyond reasonable doubt, that: (1) appellant intended to participate in a group of three or more; (2) the group intended to work together in ongoing criminal activities; and (3) appellant unlawfully distributed or delivered a controlled substance. That he unlawfully distributed or delivered a controlled substance is not contested by appellant. Nor is it disputed that a group of three or more existed. Instead, appellant focuses upon the *mens rea* aspect of section 71.02(a). In doing so, he contends that the State failed to prove that he and the members of the group intended to work together in a continuing course of criminal activities. We agree.

■ In viewing the record in a light most favorable to the verdict, we discover evidence illustrating that Mendoza sold a controlled substance to Arredondo more than once and that Marin helped in his endeavors. Additionally, when an unusually large quantity (by local standards) of marijuana was needed to sell to Arredondo, Mendoza turned to appellant, and the latter obtained it. The evidence also indicates that others helped appellant obtain the contraband, that appellant provided Mendoza with a sample to show Arredondo, and that he directed Arredondo to the cooler once Arredondo arrived. Absent from this record, however, is any evidence (direct or circumstantial) from which one could infer that appellant agreed with anyone, including Mendoza and Marin, to act together for the purpose of pursuing a *continuing* course of criminal activity or to act together for any other purpose. For

instance, there is no evidence of any discussions between appellant, Mendoza, Marin or anyone else about having provided contraband in the past or providing it in the future. Indeed, when Mendoza needed drugs before and after the Arredondo transaction, he acquired same from Angel Lamar, not appellant. And, whether Angel Lamar was in anyway associated with appellant goes unaddressed in this record.

Nor is there evidence suggesting that appellant even knew Mendoza and Marin were involved in any drug transactions other than the one which resulted in this appeal. At best, the evidence of record merely shows that appellant agreed to provide and did provide Mendoza and Marin contraband in this one instance. Similarly, while Marin insinuated that she had her own supplier for other deals in which she may have been involved, nothing of record begins to suggest that the person was appellant.

Nor are we able to conclude that evidence of record supports a reasonable inference that appellant agreed to combine with his wife, children or the two unknown Hispanics for the purpose of engaging in continuing activities. Admittedly, all were present when the sale to Arredondo was occurring and most likely knew what was transpiring. And, while it could be said that Carlos Munoz (one of appellant's children) assisted in the transaction by trying to dispose of the drug during the raid, no evidence begins to suggest that he played any role in any other transactions of his father or that he so desired or intended. The same can be said of Viola Munoz, the minor son, and the two unknown Hispanics. They were present and undoubtedly knew what was happening, but we are unable to say that a fact-finder could *reasonably* infer from mere presence and knowledge of the circumstances any agreement to jointly engage in illegality over the course of time. Moreover, it is these indicia, or lack thereof, that distinguish our situation from that in *Mast.*

In *Mast,* four people lived in the house wherein the homeowner hid stolen tools and all four knew that the tools were stolen. *Mast v. State,* 8 S.W.3d at 369. All knew where they were concealed and that the "plan" was to sell them. *Id.* Moreover, three of the four performed acts which manifested their involvement, including hiding the tools and personally negotiating their sale to others. None of that appears here. Other than the attempt by Carlos to dispose of the drugs, the evidence does not show that Carlos, Viola, the minor child, or the two unknown Hispanics negotiated the sale, hid the drugs, delivered the drugs, acted as security, or the like. Again, aside from Carlos, the most that can be gleaned from the record is that they were just present and knew what was occurring. Moreover, as for Carlos, nothing indicates that he did or intended to do anything other than dispose of the marijuana in this one transaction. At this juncture, we hesitate to conclude that mere presence at the scene and knowledge of what is occurring evinces an agreement to assist in the past or at the moment or in the future.

In effect, the circumstances before us liken, in the abstract, to those of *Ross.* Several individuals came together with the intent to consummate one particular illegal act and in the course of doing so, committed other crimes. Yet, when the particular act was consummated, nothing suggested that they intended, desired, or agreed to continue working together. As in *Ross,* any conclusion here that the participants intended to work together in a continuing course of criminal *activities* would be founded on nothing more than speculation and hunch. And, while speculation and hunch may ultimately prove accurate, it cannot be the basis of a jury verdict. Thus, we hold 1) that no evidence exists to support a finding that appellant agreed to work with Mendoza, Marin or anyone else in a *continuing* course of criminal activities and 2) that the evidence is legally insufficient to support appellant's conviction.

The arguments proffered by the State do not change our conclusion. For instance, and unlike the evidence in *Barber v. State, supra* (a case upon which the State relies heavily), there is none at bar suggesting that appellant, Mendoza and anyone else leased premises, bought equipment, opened bank accounts, and hired employees. Admittedly, from evidence of such extensive expenditures and conduct one could reasonably infer that the participants intended to engage in ongoing criminal activities. We, however, have no such evidence before us.

Similarly distinguishable are *Beaver v. State,* 942 S.W.2d 626 (Tex.App.—Tyler 1996, pet. ref'd), *Strong v. State,* 805 S.W.2d 478 (Tex.App.—Tyler 1990, pet. ref'd), *Barnes v. State,* 797 S.W.2d 353 (Tex.App.—Tyler 1990, no pet.), and *Castillo v. State,* 761 S.W.2d 495 (Tex.App.— Waco 1988) *aff'd,* 810 S.W.2d 180 (Tex. Crim.App.1990), which the State cites as authority holding that notebooks seized during the arrest may constitute evidence of an intent to engage in continuing criminal activity. In each of the aforementioned cases, the respective court described the notebooks as "contain[ing] information about … drug transactions," *Beaver v. State,* 942 S.W.2d at 631, "document[ing] numerous drug transactions," *Strong v. State,* 805 S.W.2d at 485, "detailing numerous drug transactions", *Barnes v. State,* 797 S.W.2d at 354, or containing "drug transaction notes … which showed cash amounts of more than $500,000." *Castillo v. State,* 761 S.W.2d at 502. At bar, however, we have no such descriptions of the small notebook found on appellant. Arredondo simply testified that it had "similarities" to the type of notebooks used by those in the drug trade. Yet, he did not identify any particular entry therein as pertaining to a drug transaction or representing someone involved in that illicit business. Nor could he do so when pressed on cross-examination. Rather, he all but conceded that he did not know what the entries or the book actually depicted. Without more, we cannot rationally conclude that a small notebook simply containing some names and phone numbers is any evidence of an intent on the part of appellant to agree to pursue ongoing criminal activities with Mendoza, Marin or some other group.

Nor can we conclude that appellant's possession of a gun and "two [other] bundles" of marijuana constitute any evidence of the "combination" mandated by statute. While the amount of contraband (two pounds) in the bundles and the manner in which they were packaged (plastic) could support an inference that appellant intended to sell it, *see Williams v. State,* 902 S.W.2d 505, 507 (Tex.App.-Houston [1 st Dist.] 1994, pet. ref'd.) (stating that intent to deliver may be inferred from such things as the location at which the defendant was arrested, the quantity of the drug in the defendant's possession, the manner of packaging, the presence of drug paraphernalia which may suggest personal use, the possession of large amounts of cash, and the defendant's status as a drug dealer), one could not infer from it whether anyone agreed to help him sell it. Indeed, whether anyone other than appellant knew of its existence also goes undeveloped in the record.

In sum, the State indicted appellant for engaging in organized crime and nothing more. Unlike the following cases in which the evidence was found sufficient to support a conviction, *Rainey v. State,* 877 S.W.2d 48, 51–52 (Tex.App.—Tyler 1994, no pet.) (videotape surveillance over a period of time in a known cocaine trafficking area that recorded several drug transactions of which appellant conducted at least two of the transactions and served as lookout for other members of the combination), *Mayfield v. State,* 906 S.W.2d 46, 49 (Tex. App.—Tyler 1995 pet. ref'd.) (videotape surveillance of an area known for drug activity where appellant appears at least eighteen times intermingling with at least five known drug dealers and was referred

to as a "fiend" or a person acting on behalf of the drug dealer in conducting drug deals with buyers), and *Castillo v. State*, 761 S.W.2d 495, 497 (Tex.App.—Waco 1988) *aff'd*, 810 S.W.2d 180 (Tex.Crim.App. 1990) (where 1,398 pounds of marijuana were found on the premises along with large sums of money in different locations and evidence of marijuana transactions), nothing in this record contains evidence permitting a rational jury to conclude that he was guilty of that particular crime. At best, the evidence merely depicts an agreement to work together in one transaction, and that is not enough under *Nguyen* and its progeny. Accordingly, we sustain appellant's first issue, conclude that it is dispositive of the appeal, reverse the judgment, and render judgment acquitting appellant.