# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-99-00520-CR

---

**Jose Guadalupe Posada, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. 0984451, HONORABLE JON N. WISSER, JUDGE PRESIDING**

---

Appellant Jose Guadalupe Posada appeals his convictions for engaging in organized criminal activity and committing the predicate offense of aggravated assault,[1] aggravated assault with a deadly weapon,[2] and engaging in organized criminal activity and conspiring to commit the predicate offense of aggravated assault.[3] The jury found appellant guilty of these three offenses and assessed his punishment at thirty-three years' imprisonment for engaging in organized criminal activity and

---

[1] *See* Tex. Penal Code Ann. § 71.02(a)(1) (West Supp. 2001). The current code is cited for convenience. Appellant was prosecuted under § 71.02 as amended by Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 9, 1997 Tex. Gen. Laws 1045, 1048.

[2] *See* Tex. Penal Code Ann. § 22.02(a)(2) (West 1994).

[3] *See* note 1. Appellant describes the offense as "conspiracy to commit aggravated assault with a deadly weapon." This description does not match the allegations of the fourth count of the indictment or the manner of submission of the fourth count to the jury.

*committing* the predicate offense, and at twenty years' imprisonment for each of the other two offenses. The jury acquitted appellant of attempted murder also alleged in the single indictment.

**Points of Error**

Appellant advances six points of error. All points challenge the sufficiency of the evidence. The first two points of error contend that the evidence is legally insufficient to prove the existence of a combination or a criminal street gang. The next two points present factual sufficiency issues concerning the existence of a combination or criminal street gang. The last two points question whether the evidence was legally or factually sufficient to prove the memberships of the combination as required by the "authorization paragraph of the court's jury charge."

Although there are three convictions being appealed, the points of error are directed only to the conviction for engaging in organized criminal activity and committing aggravated assault as alleged in paragraphs I and II of count I of the indictment. Appellant's brief presents argument and cites authorities only to that conviction. *See* Tex. R. App. P. 38.1(h).

**Background**

Section 71.02 of the Texas Penal Code (engaging in organized criminal activity) provides in pertinent part:

(a) A person commits an offense if, with intent to establish, maintain, or participate in a combination or in the profits of a combination *or* as a member of a criminal street gang, he commits or conspires to commit one or more of the following

(1) murder, capital murder, arson, aggravated robbery, robbery, burglary, theft, aggravated kidnapping, kidnapping, aggravated assault, aggravated sexual assault, sexual assault, forgery, deadly conduct, assault punishable as a Class

2

> A misdemeanor, burglary of a motor vehicle, or unauthorized use of a motor vehicle. . . .

Tex. Penal Code Ann. § 71.02(a)(1) (West Supp. 2001) (emphasis added).[4]

Under section 71.02(a), a defendant may, *inter alia*, commit the offense of engaging in organized criminal activity with the intent to establish, maintain, or participate in a "combination" *or* a "criminal street gang"[5] by committing *or* conspiring to commit a predicate offense named in the statute. The terms "combination" and "criminal street gang" are defined by statute. *See id.* § 71.01(a), (d). All of this will become important to our discussion of the instant case.

Count I, paragraph I of the indictment alleged that Jose Guadalupe Posada (appellant), Eric Lee Trevino, Daniel Adam Granados, John Albert Chavez, Jose Luis Gomez, and Alejandro Ruiz, with intent to establish, maintain, or participate in a combination, committed the offense of aggravated assault of Richard Martinez. Paragraph II of count I alleged that the same named individuals, as members of a criminal street gang, committed the aggravated assault of Martinez. There were no motions to quash nor any trial objections to any defect, error, or irregularity to the form or substance of the single indictment. Thus, appellant has forfeited any right to complain of any

---

[4] Other offenses are enumerated in section 71.02(a)(2)-(11). Tex. Penal Code Ann. § 71.02(a)(2)-(11) (West Supp. 2001).

[5] "Criminal street gang" was added to section 71.02 in 1991. Act of May 27, 1991, 72d Leg., R.S., ch. 555, § 1, 1991 Tex. Gen. Laws 1968, 1970. Because it overlapped "combination" and because of problems in prosecution, the term was eliminated in 1993. Act of May 27, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3698-99. Under any circumstances, "criminal street gang" was reinserted in section 71.02 in 1995. Act of May 29, 1995, 74th Leg., R.S., ch. 318, § 24, 1995 Tex. Gen. Laws 2734, 2743-44. *See generally* Ed Kinkeade & S. Michael McCullough, *Texas Penal Code Annotated*, § 71.01, at 524 (1999-2000 ed.).

3

defect, error, or irregularity in the indictment on appeal. *See* Tex. Code Crim. Proc. Ann. art. 1.14(b) (West Supp. 2001). Appellant does not raise such issue on appeal.

Appellant and Eric Trevino were tried jointly under the indictment. Ruiz and Gomez testified as accomplice witnesses after a grant of testimonial immunity.

**Facts**

The evidence reveals that Ricardo (Ricky) Martinez, the victim of the aggravated assault, was shot by mistake in the belief that he was one Santos Hernandez.

Michael Ojeda, age eighteen, testified that on June 16, 1998, he, his sister, Marie Lara, and Ricky Martinez attended Del Valle High School's summer school program. They left school that day about 12:45 p.m. in Ojeda's maroon Volkswagon Jetta. Ojeda was driving, his sister sat in the passenger seat, and Martinez was in the rear seat. As they drove by the nearby Circle K convenience store, Ojeda noticed a white sedan and gray truck in the store's parking lot. The white sedan tried to pull out in front of Ojeda, but Ojeda passed it and turned north on FM 973. The pickup truck passed the white sedan and then tried to pass Ojeda's Jetta. Ojeda was driving at speeds of 80-85 miles per hour to avoid being cut off. The truck pulled within five feet of Ojeda traveling in the southbound lane. Ojeda then heard a gunshot. His sister jumped into the back seat with Martinez. Ojeda slammed on the Jetta's brakes and the truck and sedan passed by. Before reaching the intersection of FM 973 and FM 969, the truck made a U-turn and drove south on FM 973. At the intersection, Ojeda drove to a construction site where a sheriff's car was parked. Martinez was bleeding and there was a bullet hole in the Jetta. Deputy Sheriff Kent Miller sent Ojeda across the highway to another deputy to call an ambulance. Miller left to pursue the gray truck, a description

4

of which he received from Ojeda along with the fact that two Hispanic males were in it. Miller stopped the truck six or seven minutes later on Highway 71. Appellant and co-defendant Eric Trevino were in the Isuzu truck belonging to appellant. Ojeda was taken to the scene of the stop and identified the vehicle as the truck involved in the shooting.

Ojeda's sister corroborated his testimony, as did Martinez. After being shot, Martinez thought he was going to die. The gunshot wound was painful. At the emergency room, Dr. Clive Smith determined that the bullet had entered Martinez's back under the arm and lodged in his lower right chest area. Dr. Smith determined that it would be too dangerous to attempt to remove the bullet, that Martinez might have lived without medical assistance, and that Martinez was lucky to be alive. Dr. David Leake, a radiologist, treated Martinez on June 19, 1998, and observed a large bullet fragment in Martinez's lower right chest.

After their arrest, appellant and his co-defendant Trevino were taken to the police station where Officer Toby Cross conducted atomic absorption tests on the hands of both individuals to determine if either one had recently fired a gun. Texas Department of Public Safety crime lab expert Ivan Wilson analyzed the results of the tests and testified that the palms and back sides of appellant's hands were positive for gunshot residue,[6] which meant that appellant had recently fired a gun, handled a gun which had been fired recently, or was in the immediate area when a gun was fired.

Lee Gonzales and his sister, Melissa Gonzales, testified that on the night before the shooting appellant came to their house, displayed a gray semi-automatic pistol and was hoping to use

---

[6] Trevino's right palm was also positive for gunshot residue.

5

it. Appellant told Lee that appellant's gang was trying to "get some guy, this Duke or whatever, for stabbing their homeboy or something in the park."

After the shooting, on the night of June 16, 1998, appellant telephoned Melissa, whom he was trying to date. Lee listened to the conversation on another telephone and told his sister to make notes. Appellant stated that another member of the Midtown Kriminals gang was in the truck with him when he shot someone. He had thrown the pistol he used into some bushes along the roadway. Melissa corroborated Lee's version of the conversation with appellant, but also pointed out that appellant said the shooting occurred about 1:00 p.m. on June 16, 1998; that all the people participating were members of the Midtown Kriminals gang; that before the shooting the gang was following someone whom they thought was Santos Hernandez; and that appellant shot at him. Lee was a friend of Ricky Martinez who had been shot. Martinez was informed and in turn told the police. A few days later, after the grass had been cut along the highway, a nine millimeter Ruger pistol was found along the route appellant had traveled after the shooting. When the pistol was shown to Lee Gonzales, he stated that it appeared to be the one appellant had displayed to him before the shooting. The Ruger pistol was test-fired and it was determined by a firearm expert that the nine millimeter spent casing found in appellant's truck had been fired by the Ruger pistol in question. It was established that this pistol was a deadly weapon.

Two written statements given by appellant to law enforcement officers were introduced after being redacted in part. In the first statement dated June 18, 1998, appellant stated that on June 15, 1998, he was instructed by John Chavez to "hook up . . . the next day," which they did at the Del Valle Circle K store around 12:30 p.m. As they left the store in pursuit of a maroon

6

car, appellant stated that Daniel Granados ("Domino") and Javier Ruiz ("Chucky") jumped into the bed of his truck; that as they drove onto FM 973, he was behind the white Nissan Stanza sedan driven by Alejandro Ruiz with John Chavez in the passenger seat; that the others were in a white Grand Am automobile behind him; that on FM 973, the Nissan began "acting up" and he jumped into the lead following "this red car." Thereafter, appellant heard a gunshot from the bed of his truck, saw a bullet hole in the red car whose passengers were leaning down. Appellant made a U-turn on FM 973 after which Javier Ruiz and Daniel Granados jumped out of his truck and got into the Nissan. Appellant saw Granados with a black bag when he left the truck, and appellant concluded that Granados was the shooter. In the second statement dated August 18, 1998, appellant admitted he had not told the truth in prior statements to the police and wanted to relate how he was involved. Appellant admitted that in 1994, he "started hanging around" with members of the Midtown Kriminals street gang (MTK); that he was jumped on and beaten by another gang who thought that he "was MTK"; that he was formally initiated in MTK in 1994 by having to fight Jose Luis Gomez; that subsequently he and other members of MTK came upon those who had "jumped" him earlier; that he wanted revenge "and Luis Gomez and MTK was ready to help"; and that a shooting followed. The shooting was identified as the Payless Store shooting. Appellant acknowledged that "Luis and I both caught cases involving drive by shooting." This is followed by a redacted portion of appellant's second statement followed in turn by "that night when I got home . . . my family had thrown a barbeque for me getting out, some of the MTK guys were at the party."

Appellant acknowledged that in May 1998 he started hanging out with MTK "real hard"; that at the end of May or the beginning of June 1998 a leadership meeting of MTK was held

7

at John Zuniga's house. John Chavez was the leader and "in charge of the entire click," and appellant stated that he (appellant) was established as leader of the Northeast area. At this meeting, appellant learned that Zuniga and Alejandro Ruiz, members of MTK, had been cut in a fight with another gang at Club Chaos.

Appellant stated that at 9:00 a.m. on June 16, 1998, he reported to his parole officer and later got a call from Chavez. Appellant met with the others alleged in the indictment, and they drove in various vehicles to the Del Valle Circle K store. As a maroon Volkswagen pulled out of the school property, appellant reported that Chavez displayed his MTK tattoos to the "dudes" in the maroon car.

Appellant's version about what happened next was similar to his earlier statement except that he did not place Granados or Javier Ruiz in his truck. Appellant, this time, explained that he was "messing" with his truck radio when he heard a gunshot and that was why the gun powder got on both his hands. The redacted statement did not reveal who was inside the truck with appellant at the time.[7]

Detective Albert Bertrand of the Austin Police Department's gang unit testified how information on gangs was gathered. He testified about the Austin gang culture in general, stating that the gangs were often affiliated with national gangs such as the Crips, Bloods, Peoples's Nation, and Folks Nation. He identified the Midtown Kriminal street gang (MTK) as originating in the Montopolis area of Austin and operating in Travis County. Detective Bertrand drew the gang's graffiti symbol for the jury and stated that the gang's color was green. A baseball bat with "MTK"

---

[7] Eric Trevino's name was redacted from the statement. He was the co-defendant on trial with appellant.

8

and "XII" written on it was introduced into evidence. Bertrand related that the "Dukes" were another predominately Hispanic gang based in North Austin. He was familiar with an Austin bar called Club Chaos, which was frequented by gang members.

Alejandro Ruiz, an indicted co-defendant, testified at the June 1999 trial that he had been a member of the Midtown Kriminal street gang for three years; that John Chavez was the leader of the gang; that he had known appellant Posada for a year and considered him a gang member and that appellant considered himself a member of the gang; that in addition to Chavez and appellant, Eric Trevino, Guillermo Navarro, Jose Luis Gomez, Antonio Gomez, Javier Ruiz (the witness's brother), and John Zuniga were all members of the gang; that there were thirty members of the MTK; and that its colors were green and beige. When shown a baseball bat (State's exhibit no. 2), Ruiz recognized the "MTK" graffiti and the Roman "XII." He explained that "XII" was for 12th Street, which the gang claimed as their turf and would fight any gang who invaded their turf. Ruiz acknowledged that he and Navarro were involved in a fist fight with the Kriminal of Art (KOA) gang at Del Valle High School. Later, Ruiz stated that he, John Chavez, and John Zuniga got into a fight with the Dukes gang in the parking lot of Club Chaos in Austin. He explained that the Dukes were affiliated with Folks Nation and that MTK was affiliated with the People's Nation. Ruiz stated that the fight started when the Dukes began to throw "gang signs." Ruiz was stabbed in the arm, and Zuniga was stabbed "all over his body."

Four or five months later, Ruiz learned from Navarro that Santos Hernandez of the Dukes was the person who had stabbed Ruiz. Ruiz reported this information to Chavez who was

9

ready "to get him." Ruiz was still in school and wanted to wait. When Ruiz was expelled, Chavez said, "Let's go get [Santos Hernandez]."

Upon instructions from Chavez, Ruiz drove his white 1990 Nissan Stanza to the Circle K store across from the high school. His brother, Javier, was with him and they arrived about 11:35 a.m. on June 16, 1998. Chavez, the Gomez brothers, Zuniga, and Granados then arrived at the store in Jose Luis Gomez's white Pontiac Grand Am. Minutes later, appellant and Trevino arrived in appellant's pickup truck. Ruiz believed Santos Hernandez would be in a maroon car since Ruiz had seen him in one in the past.

Ruiz confirmed that all present had a plan concerning the maroon car. The truck, followed by the other two cars, would "box in" the maroon car, causing it to stop. Then Ruiz was to have a fist fight with Hernandez, whom he wanted to hurt, even to the point of permanently disabling Hernandez. The other gang members would be his "back-up" in case Hernandez tried to use a weapon. Ruiz did not see any gun during the preparations at the Circle K store.

Ruiz stated that he did not see the shooting as his car could not keep up with the truck. He saw appellant's truck make a U-turn at the intersection of FM 973 and FM 969. Ruiz turned onto FM 969 when he saw the sheriff's cars. The Grand Am followed suit and both cars stopped at a store on FM 969.

Jose Luis Gomez, another co-indictee, testified that he was a former member of the Midtown Kriminals and had known appellant and Trevino since childhood. Gomez related that on August 21, 1995, he shot at several people at the Payless Store on Manor Road in Austin. Appellant drove the car while Gomez was shooting. Gomez tried to stress that although his dispute was with

10

a person in another gang, the fight was personal and not gang related.  Gomez said that he quit the MTK after his release from the Texas Youth Commission in 1997.  However, he was present at the Circle K store on June 16, 1998 and corroborated the version of events given by Ruiz about what happened at the Circle K store and the plan for Ruiz to get into a fist fight with "somebody."  While Gomez was in his car following Ruiz's vehicle, he denied chasing the maroon Jetta.

Appellant rested his case without calling any witnesses.  Thus, all the testimony at the guilt-innocence stage of the trial came from the State's witnesses.  We turn now to the legal and factual sufficiency of evidence raised by appellant.

**The Standard of Review—Legal Sufficiency**

The standard for reviewing the legal sufficiency of evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the offense charged. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1994, pet. ref'd). The standard of review is the same in both direct and circumstantial evidence cases.  *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995); *Green v. State*, 840 S.W.2d 394, 401 (Tex. Crim. App. 1992).  The State may prove its case by circumstantial evidence if it proves all of the elements of the charged offense beyond a reasonable doubt.  *Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (citing *Jackson*, 443 U.S. at 319).  The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused.  *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987).  It is important to remember that all the evidence the jury was permitted, properly or improperly, to

11

consider must be taken into account in determining the legal sufficiency of the evidence. *Garcia v. State*, 919 S.W.2d 370, 378 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.).

The jury is the exclusive judge of the facts proved, the weight to be given the testimony, and the credibility of the witnesses. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995); *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). The jury is free to accept or reject any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.); *Hernandez v. State*, 939 S.W.2d 692, 693 (Tex. App.—Fort Worth 1997, pet. ref'd). Moreover, the reconciliation of evidentiary conflicts is solely within the province of the jury. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

Under the *Jackson* standard, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence. Rather, it is to position itself as a final due-process safeguard insuring only the rationality of the fact finder. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). It is not the reviewing court's duty to disregard, realign, or weigh the evidence. *Id.* The jury's verdict must stand unless it is found to be irrational or unsupported by more than a "mere modicum" of evidence, with such evidence being viewed in the light of *Jackson. Id.* The legal sufficiency of the evidence is a question of law. *McCoy v. State*, 932 S.W.2d 720, 724 (Tex. App.—Fort Worth 1996, pet. ref'd).

12

**The Standard of Review—Factual Sufficiency**

A review of the factual sufficiency of the evidence begins with the presumption that the evidence supporting the judgment was legally sufficient. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In such a review, we consider the evidence without employing the prism of "in the light most favorable to the verdict." *Id.* at 129. A reviewing court must consider all the evidence impartially, comparing evidence that tends to prove the existence of a disputed fact or facts with evidence that tends to disprove that fact or those facts. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). The verdict or judgment is to be set aside only when the factual finding is against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 129. In the factual sufficiency analysis, it must be remembered that the trier of fact is the sole judge of the weight and credibility of the testimony. *Santellan*, 939 S.W.2d at 164. Appellate courts should be on guard not to substitute their own judgment in these matters for that of the trier of fact. *Id.* One principle of the factual sufficiency analysis is deference to the findings of the jury or other fact finder. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Moreover, "[a] decision is not manifestly unjust merely because the jury [or fact finder] resolved conflicting views of the evidence in favor of the *State*." *Id.* at 410.

In the latest clarification of the standard of review involved, the Court of Criminal Appeals made clear that the *Clewis* criminal factual sufficiency review encompasses both formulations utilized in civil jurisprudence. Thus, in conducting a *Clewis* sufficiency review of the elements of a criminal conviction, an appellate court must ask whether a neutral review of all the evidence, both for or against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine

the confidence in the jury's determination, *or* that the proof of guilt, although adequate taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

Here, appellant's arguments on legal and factual sufficiency are commingled. *Johnson* is not cited and appellant does not inform us of which formulation he contends was not satisfied. We, however, will now consider the sufficiency issues raised in the first four points of error.

### Discussion

"Combination" as defined by statute

> means three or more persons who collaborate in carrying on criminal activities, although (1) the participants may not know each other's identity; (2) membership in the combination may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's length relationship in illicit distribution operations.

Tex. Penal Code Ann. § 71.01(a) (West Supp. 2001). This definition of "combination" has been interpreted by the Court of Criminal Appeals as obligating the State to prove in a prosecution under section 71.02(a) of the Penal Code not only that the defendant intended to establish, maintain, or participated in a group of three or more, but also that the members of the group intended to work together in a continuing course of criminal activity. *Dowdle v. State*, 11 S.W.3d 233, 235-36 (Tex. Crim. App. 2000); *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999); *Munoz*, 29 S.W.3d 205, 208 (Tex. App.—Amarillo 2000, no pet.). Given the statutory definition and the court's interpretation, section 71.02(a) requires proof of two different *mens rea*—that of the accused and that of the group—a dual intent requirement. *Munoz*, 29 S.W.3d at 208.

14

Moreover, the continuing course of criminal activity referred to must encompass more than just one crime or offense. *Nguyen*, 1 S.W.3d at 697, or one criminal episode. *Ross v. State*, 9 S.W.2d 878, 882 (Tex. App. Austin 2000, pet. ref'd). It is not enough for the State to show that the group came together to commit one offense. *Ross*, 9 S.W.3d at 882; *see also Minor v. State*, 9 S.W.3d 835 (Tex. Crim. App. 2000). The facts in *Nguyen* were held insufficient to show a continuing course of criminal activity because the group involved simply desired to avenge an insult. *Nguyen*, 1 S.W.3d at 696-97. Once the insult was avenged, the reason for and the existence of the group dissipated. *Id.*

Likewise in *Ross*, the young men forming the group were overcome with road rage and sought to retaliate against a woman who purportedly cut them off while driving. 9 S.W.3d at 880. The group committed several criminal offenses in pursuing its goal of retaliation but the evidence did not indicate that once it achieved its goal the group intended to continue its illegal conduct. This Court in *Ross* held that the evidence at most simply depicted that the members of the group temporarily organized to commit one criminal episode, which did not meet the requirements of section 71.02(a). *Id.* at 882.

The fact that the life of a group may be brief does not immunize one from prosecutions long as the evidence reveals the requisite *mens rea*. In *Mast v. State*, 8 S.W.3d 366 (Tex. App.—El Paso 1999, no pet.), the facts demonstrated the group existed to sell tools that had been stolen. While nothing in the opinion suggests that the group intended to pursue its operations once the tools were sold, the reviewing court found that the requisite intent existed to pursue a course of criminal

15

activity. This was so because the evidence showed at least two other criminal transactions during the group's brief life. *Id.* at 370.

*Mens rea* is a rather difficult element to prove via direct evidence. In a contested case, an accused does not often facilitate his own conviction by admitting to having the state of mind necessary to support the conviction. Thus, circumstantial evidence may be used to prove it. *Carlson v. State*, 940 S.W.2d 776, 779 (Tex. App.—Austin 1997, pet. ref'd); *see also Munoz*, 29 S.W.3d at 209; *Morales v. State*, 828 S.W.2d 261, 263 (Tex. App.—Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex. Crim. App. 1993). Intent and knowledge can be inferred from the conduct of, remarks by, and circumstances surrounding the acts engaged in by the accused. *Parramore v. State*, 853 S.W.2d 741, 745 (Tex. App.—Corpus Christi 1993, pet. ref'd); *see also Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982); *Skillern* , 890 S.W.2d at 880. Circumstantial evidence may also be used to prove the existence of an agreement to collaborate in continuing criminal activity. *Munoz*, 29 S.W.3d at 209; *Mast*, 8 S.W.3d at 369. "Evidence of the acts and conduct of the conspirators, as well as circumstances surrounding these acts and conduct can be used to show the existence of a positive agreement." *Kennard v. State*, 649 S.W.2d 752, 763 (Tex. App.—Fort Worth 1983, pet. ref'd).

The underlying offense at bar involves the aggravated assault of Ricky Martinez. Thus, under count I, paragraph I of the indictment, the State was obligated to prove beyond a reasonable doubt that on or about June 16, 1998, (1) appellant intended to participate in a group of three or more, (2) the group intended to work together in ongoing criminal activities, and (3) appellant acting with the combination, committed the alleged aggravated assault.

16

Under count I, paragraph II of the indictment, the State was obligated to prove beyond a reasonable doubt that on or about June 16, 1998, appellant (1) intended to establish, maintain, or participate in a criminal street gang, (2) which has a common identifying sign or symbol or an identifiable leadership, (3) whose members continuously or regularly associate in the commission of criminal activities, and (4) appellant, acting with a criminal street gang, committed one of the predicate offenses under section 71.02(d)—here aggravated assault.[8]

It must be kept in mind that the terms "combination" and "criminal street gang" as defined in section 71.01 of the Penal Code[9] often overlap when both terms are used in alleging the offense of engaging in organized criminal activity as in the case *sub judice*. In submitting count I of the indictment to the jury, the trial court used the terms disjunctively. Thus, both means or ways of committing the offense charged in count I must be considered in any discussion of the sufficiency of the evidence.

Regarding both methods of committing the offense of engaging in organized criminal activity, we observe that appellant concedes that the State's proof of the commission of the predicate offense of aggravated assault is legally and factually sufficient. The evidence clearly supports this concession. A reiteration of the facts is not needed. Other evidence showed that the MTK gang was well known to the police, that it had a common symbol, its color was green, and that its identified

---

[8] "'Criminal street gang' means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." Tex. Penal Code Ann. § 71.01(d) (West Supp. 2001). The definition is unchanged from Act of May 10, 1997, 75th Leg., R.S., ch. 189, § 9, 1997 Tex. Gen. Laws. 1045, 1048 (Tex. Penal Code § 71.01, since amended), under which appellant was prosecuted.

[9] *See* Tex. Penal Code Ann. § 71.01(a), (d) (West Supp. 2001).

leader was John Chavez. In 1994, appellant began associating with the MTK gang and was initiated into the gang the same year. He was involved in the Payless Store shooting with the MTK gang, "caught" a drive-by shooting charge in 1995, and later got "out" and was reporting to his parole officer. In May 1998, appellant started "hanging out" with the gang "real hard." In May or early June 1998, appellant was assigned a leadership role in the gang, and he learned of his gang's fight with the Dukes at Club Chaos in which Zuniga and Alejandro Ruiz had been stabbed. Other evidence showed earlier fights with other gangs at Del Valle High School and on Patton Lane. The facts reveal that appellant knew of the criminal activities of the combination, criminal street gang, or group. *See McDonald v. State*, 692 S.W.2d 167, 172 (Tex. App.—Houston [1st Dist.] 1985 pet. ref'd); *Lucario v. State*, 677 S.W.2d 693, 698-99 (Tex. App.—Houston [1st Dist.] 1984, no pet.). Appellant's acts, works, and surrounding circumstances as reflected by the record clearly showed appellant's intent to willingly participate in the activities of a combination or gang of three or more persons and to agree and engage in the commission of aggravated assault. The direct and circumstantial evidence also established the intent of the combination to work together in a continuing course of criminal activity and the intent of the criminal street gang who regularly associated in the commission of criminal activities. There was "something more" than the commission of the aggravated assault offense by a group of three or more individuals. *See Nguyen*, 1 S.W.3d at 697. The record reflects that the gang "regularly" associated in criminal activities as described, continued to claim their turf on 12th Street, and called a meeting to determine if anyone was "snitching" about the gang's commission of the aggravated assault. Chavez, the leader, also instructed Alejandro Ruiz to paint his car to obstruct the police in their investigation of that offense. The evidence shows the

18

"continuity" of the combination as discussed in *Nguyen*. *See id.* There is no requirement that a combination commit a series of criminal acts to support a conviction. *Id.* Acts engaged in by the combination to support the "something more" requirement need not be criminal offenses in and of themselves. *Id.*

Moreover, in submitting the case to the jury, under count I, paragraphs I and II, the trial court authorized appellant's conviction for engaging in organized criminal activity if the predicate offense (aggravated assault) was committed while appellant was establishing, maintaining, or participating in either a combination *or* a criminal street gang. The jury returned a general verdict: "We, the jury, find the defendant Jose Guadalupe Posada guilty of the offense of Organized Criminal Activity, as alleged in count one of the indictment." Where different theories of the offense are submitted to the jury in the disjunctive, a general verdict is sufficient if the evidence supports one of the theories. *Brooks v. State*, 990 S.W.2d 278, 283 (Tex. Crim. App. 1999); *Fuller v. State*, 827 S.W.2d 919, 931 (Tex. Crim. App. 1992); *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991).

While the general verdict here is sufficient under the foregoing authorities, we find both theories supported by the evidence. Contrary to appellant's contentions, we conclude that the evidence is both legally and factually sufficient to establish the existence of a combination and of a criminal street gang. We reject appellant's argument that the gang did not "regularly" associate in the commission of criminal activities.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that any rational trier of fact could have found beyond a reasonable doubt all the essential elements of the

19

offense charged in count I of the indictment. *See Jackson*, 443 U.S. at 319; *Skillern*, 890 S.W.2d at 879. The evidence was legally sufficient to support the conviction. Applying the standard of review for factual sufficiency, including a neutral review of all the evidence, we conclude that the proof of guilt is not so obviously weak as to undermine the confidence in the jury's verdict or that the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *See Johnson*, 23 S.W.3d at 11; *Clewis*, 922 S.W.2d at 129. Points of error one through four are overruled.

### Another Sufficiency Issue

In his fifth and sixth points of error, appellant separately contends that the evidence is legally and factually insufficient to prove the membership of a combination as required by the "authorization" paragraph of the charge submitted under count I of the indictment. Appellant argues that the State did not object to the court's jury charge and thus was bound to prove the combination was composed of appellant and the five others named in the application paragraph of the charge rather than "three or more" as included in the statutory definition of a combination set forth in the abstract portion of the court's charge. Appellant argues that the State failed to prove that Daniel Granados was a member of the combination as required by the application paragraph of the charge.

Appellant relies upon *Fee v. State*, 841 S.W.2d 392, 395-96 (Tex. Crim. App. 1992) and *Ortega v. State*, 668 S.W.2d 701, 707 (Tex. Crim. App. 1983). Appellant overlooks that *Fee* and *Ortega* were a part of the *Benson-Boozer*[10] line of cases which was overruled by *Malik v. State*, 953 S.W.2d 234, 239-49 (Tex. Crim. App. 1997). *Malik* points out "that the sufficiency of the

---

[10] *See Benson v. State*, 661 S.W.2d 708 (Tex. Crim. App. 1982); *Boozer v. State*, 717 S.W.2d 608 (Tex. Crim. App. 1984).

20

evidence should be measured by the elements of the offense as defined by a hypothetically correct jury charge for the case." *Id.* at 240. "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Moreover, appellant does not successfully distinguish the case at bar from *Crum v. State*, 946 S.W.2d 349 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd), and *Jones v. State*, 907 S.W.2d 850 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). In *Jones,* decided while the *Benson-Boozer* line of cases was still viable, the court distinguished *Fee.* The State was not required to prove the participation of all those persons listed in the jury charge in a combination with appellant, in light of the statutory definition of "combination" given in the abstract portion of the charge and the qualification of that term in the application paragraph. *Jones*, 907 S.W.2d at 854. In *Crum*, also decided before *Malik*, the jury charge contained the statutory definition of a "combination," but it was not repeated in the application paragraph. Noting that it was confronted with the same issue as in *Jones*, the *Crum* court held that the failure of the jury charge to repeat the definition of "combination" in the application paragraph neither affected the meaning of the charge nor increased the State's burden of proof. *Fee* and *Ortega* were distinguished. *Crum*, 946 S.W.2d at 356. Appellant's claim that *Jones* and *Crum* are distinguishable from the instant case does not mention *Malik*, but contends that the listing of the names of all participants in a co-dependant clause in the application paragraph renders *Jones* and *Crum* inapplicable. We do not agree. It is unnecessary to repeat every abstract

21

definition in the application paragraph of the jury charge. *See Dinkins v. State*, 894 S.W.2d 330, 339-40 (Tex. Crim. App. 1995).

Moreover, and most importantly, the evidence shows that appellant, Granados, and the others alleged in the first paragraph of the first count of the indictment and named in the application paragraph of the charge were members of a combination. Appellant's argument to the contrary is based on the fact that some of the evidence reflects Granados was not a member of the MTK criminal street gang. Appellant relies upon the testimony of the accomplice witness Ruiz, but Ruiz acknowledged that Granados was allowed to participate in the gang's activities because he was "a friend" and "hung out" with the gang on several occasions prior to June 16, 1998, the date of the aggravated assault. Appellant told Melissa Gonzales that all those who participated in the shooting were MTK members and this included Granados. Other evidence reflects Granados's association with the gang.

Reconciliation of evidentiary conflicts is solely the function of the jury. *Miranda v. State*, 813 S.W.2d 724, 733-34 (Tex. App.—San Antonio 1991, pet. ref'd). The jury was not required to accept Ruiz's testimony. Even if the jury could have found that Granados was not a member of the gang, this would not have prevented the jury from finding under the evidence that Granados was one of the six named individuals involved in the combination, nor would it have undermined appellant's conviction for engaging in organized criminal activity as a member of a criminal street gang of three or more.

Utilizing the standards of review for legal and factual sufficiency claims, we overrule the fifth and sixth points of error. Here again, we note that where different theories of the offense

are submitted in the disjunctive to the jury, a general verdict is sufficient if the evidence supports one of the theories. *Brooks*, 990 S.W.2d at 283.

**Aggravated Assault**

Appellant has presented no point of error concerning the aggravated assault conviction. *See* Tex. R. App. P. 38.1. In his appellate brief, appellant concedes that the State's proof of the aggravated assault "was legally and factually sufficient." When an appellant presents no argument or cites any authorities to support his position, nothing is presented for review. *Id.*; *Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000); *Dunn v. State*, 951 S.W.2d 478, 480 (Tex. Crim. App. 1997).

**Conviction Under Fourth Count**

Appellant refers to his conviction under the fourth count of the indictment as "conspiracy to commit aggravated assault with a deadly weapon as a member of a combination and as a member of a criminal street gang in violation of Tex. Penal Code §§ 15.02 and 71.02." An examination of the fourth count, however, reveals that it is a duplicate of the first count and both its paragraphs, except that it alleges that the offense of organized criminal activity was committed by appellant and others who did "conspire and agreed" to commit the predicate offense of aggravated assault rather than alleging "did commit" the same predicate offense as in the first count. The fourth count merely alleged a different means of committing the offense of which appellant was convicted in the first count. *See McIntosh v. State*, No. 755-00 (Tex. Crim App. June 27, 2001) at slip op. 3-4. The trial court submitted the fourth count to the jury in accordance with its allegations.

Appellant has not briefed any contentions concerning this latter conviction. *See* Tex. R. App. P. 38.1(h). Nothing is presented for review. *Dunn*, 951 S.W.2d at 480; *Lockett v. State*, 16 S.W.3d 504, 505 n.2 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *Price v. State*, 15 S.W.3d 577, 578-79 (Tex. App.—Waco 2000, pet. ref'd).[11]

The judgment is affirmed.

John F. Onion, Jr., Justice

Before Chief Justice Aboussie, Justices Yeakel and Onion[*]

Affirmed

Filed:   August 30, 2001

Do Not Publish

---

[11] A multiple punishments double jeopardy claim is forfeited if not preserved at trial before the court's charge is submitted to the jury. *See Gonzalez v. State*, 8 S.W.3d 640, 642 (Tex. Crim. App. 2000). Appellant made no trial objection nor does he raise the issue for the first time on appeal and seek to meet the revival test. *Id.* at 643.

\*    Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).