Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB









Opinion Issued July 20,
2006

 

 

 

 














 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-05-00590-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



MANUEL RENTERIA, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 184th District Court

Harris County, Texas

Trial Court Cause No. 1020383

 








 

 



O P I N I O N

          The State charged Manuel
Renteria with the felony offense of engaging in organized criminal activity,
for which the jury found him guilty. 
After finding an enhancement paragraph true that Renteria previously had
been convicted of a felony offense, the trial court sentenced Renteria to forty-five
years’ imprisonment.  In two issues on
appeal, Renteria contends (1) the evidence is legally insufficient to
demonstrate either the individual or group mens rea required to support
his conviction, and (2) the trial court erred in not requiring the State to
elect one paragraph from the indictment on which to proceed.  We affirm.

Background

          In
June 2002, police officers recovered an abandoned salvage vehicle from a body
shop in Fort Bend County, with its Vehicle Identification Number (“VIN”) and
other identifying information removed. 
Sergeant Cantu, an investigator for the Motor Vehicle Theft Division of
the Texas Department of Public Safety, examined the vehicle, determined its
VIN, and discovered that the VIN had recently been re-registered, indicating
the VIN probably had been placed on a stolen vehicle that had been sold and
registered under the salvage VIN.  Cantu
and his partner, Sergeant Kucifer, subsequently began investigating a series of
similar vehicles, most of them late-’90s Ford or Chevrolet extended-cab
step-side trucks.  Cantu and Kucifer
determined that the vehicles had been purchased at salvage, whereupon their VINs
and mylar federal safety stickers were removed and placed on stolen
vehicles.  The altered, stolen vehicles
were then sold at local flea markets.  Cantu
and Kucifer visited salvage dealers and compiled lists of the individuals
purchasing salvage vehicles.  Based on
the recurring names on those lists, the investigators created a list of suspects
and a list of “target vehicles” that had been purchased at salvage auctions by
those suspects.  The VIN numbers from
those target vehicles later appeared on stolen vehicles.  The officers linked the stolen vehicles sold
at the flea market to the suspected auto theft ring because the vehicles bore paper
license plates with the name “ZM Auto Sales.”  In addition, many of the vehicles had been
registered at AAA Title Services.  The
investigators ultimately determined that 137 vehicles had been stolen, altered,
and sold by Renteria, Jose Nieto, Pius Opondo, Ezequil Ponce, Jose Adame
(“Jose”), Angel Adame (“Angel”), Francisco Barrera, and Hugo Rodriguez, who the
State tried at the same time as Renteria. 


At trial, Bernardo Zuniga testified
that he purchased a 1997 Ford step-side pickup truck from Ponce at the flea
market in May 2002.  The truck was
stolen.  Zuniga later identified Ponce
from a photo line-up and in court. 
Armando Garcia testified that he purchased a 1997 extended-cab Ford
truck, later determined to be stolen, from Rodriguez at the flea market.  Rene Sanchez testified that Rodriguez sold
him a stolen black Ford truck at a flea market in April 2002, and that Renteria
later traded a stolen Chevrolet truck for a Ford truck with Sanchez’s brother,
Cerillo.  Cerillo Sanchez testified that
Renteria sold him a stolen red step-side truck at the flea market in April
2002.  Police officers observed Aldo
Perez at the flea market attempting to sell one of the vehicles associated with
the investigation.  Alfredo Saucedo
testified that he purchased an extended-cab step-side Ford truck, later
determined to be stolen, that he had seen at the flea market from Renteria in
March 2002.  He later traded the truck
back to Renteria for another stolen truck. 


Another witness informed
investigators that Nieto had sold him a stolen vehicle.  Investigators discovered a “ZM Auto Sales”
tag on that vehicle.  When investigators
went to Nieto’s address, they discovered another stolen vehicle for sale in the
driveway.  The investigators arrested
Nieto and obtained consent to search his house. 
In his house, they discovered a Ford ignition switch and a registration
receipt for yet another stolen vehicle.  They also discovered a driver’s license and
credit card belonging to Yolanda Brignac, whose vehicle had been stolen and
linked to this particular auto theft ring. 
Brignac testified that her extended-cab side-step Ford truck was stolen
in July 2002, and that her purse was in the truck when it was stolen.

          The
State charged Filomeno Adame (“Filomeno”) with stealing four of the vehicles
associated with the ring.  Filomeno had a
relationship with Renteria’s daughter, and he helped Renteria sell stolen trucks.  Renteria gave him the trucks to take to the
flea market, and would pay him $300 to sell the trucks.  Renteria instructed Filomeno to refer
purchasers to AAA Title Services. 
Filomeno also helped Renteria clean the trucks to prepare them for sale
at a house on Heatherbrook.  Filomeno
testified that his brother Angel lived in the house, but Angel decided to move,
and Renteria offered to continue to pay the rent so Renteria could work on the
trucks there.  In all, Filomeno helped
Renteria sell ten trucks.  Filomeno saw
Renteria remove VINs from the vehicles and replace them with different
VINs.  Filomeno pled guilty to theft in
April 2003.  He cooperated with
prosecutors in exchange for a lighter sentence. 

          Eva
Renteria, Renteria’s daughter, testified that her father was unhappy when he
discovered that she was dating Filomeno, who was married.  When Filomeno was in jail for theft charges,
Filomeno called her often asking questions about Rodriguez and Renteria.  She testified that Filomeno hated her father,
and had accused her of cheating on him with Rodriguez.  She further testified that Filomeno was
living with his brother, Angel, and that the two of them drove different trucks
every week.  

          Alfredo
Ramiro owned Bronco’s Auto Sales.  A
licensed salvage dealer, he purchased salvage vehicles on behalf of members of
the auto theft ring.  Ramiro bought cars
from salvage auctions, repaired them in his salvage shop, and sold them.  Ramiro testified that Renteria approached him
and told him that he bought many trucks, and inquired if Ramiro could buy some
salvage trucks for him.  Renteria visited
the auction yard the day before the auction, and then told Ramiro which
vehicles he wanted to purchase.  Renteria
paid Ramiro for purchasing the vehicles for him.  Ramiro estimated that he bought thirty
vehicles for Renteria at the salvage auction. 
Renteria paid him one hundred dollars per vehicle.  Renteria introduced Ramiro to Rodriguez, and
told him that Rodriguez would attend the auctions and would tell him how much
to bid for the trucks they wanted to purchase. 
Ramiro saw Rodriguez, Renteria, Nieto, and Angel together at the
auctions.  He purchased vehicles for all
of them on occasion because he believed them to be part of the same group.  

Cantu and Kucifer testified that
forty-three of the salvage vehicles whose VINs had been found on stolen
vehicles were towed to a salvage yard in Wallis, Texas and abandoned.  Charles Spates testified that Rodriguez paid
him a couple of hundred dollars to store between two and four vehicles
temporarily on his property, and made an arrangement thereafter for wrecker
drivers to deliver and store other vehicles on Spates’s property.  Spates testified that around forty vehicles
were stored on his property by Rodriguez’s associates. Cantu testified that investigators
found these vehicles on the Spates property with their VINs removed.  

Cantu and Kucifer received an
anonymous tip that illegal activity related to the auto theft ring had occurred
at the residence on Heatherbrook.  Cantu
and Kucifer obtained a search warrant and searched the home.  In the nearly empty home, they discovered a
stack of “ZM Auto Sales” tags, as well as two stolen Ford trucks for sale in
the driveway, bearing “ZM Auto Sales” tags, and a hair dryer.  Both testified that thieves commonly use hair
dryers to heat mylar stickers to easily remove them.  They also discovered white spray paint, which
Kucifer testified thieves commonly use as an adhesive to reapply mylar stickers
because it disguises the “void” message that appears when mylar stickers initially
are removed.  In addition, they
discovered license plates belonging to several vehicles reported stolen that
had not been recovered.  The house was
rented under the name of Angel Adame.  

Investigators conducted surveillance
of Ponce’s residence on Ruellen.  While
observing the residence, Rodriguez drove up, exited his car, had a brief
conversation with Ponce, and left. 
Kucifer followed Rodriguez, and determined that the Ford truck he was
driving was stolen.  Police later found
that vehicle in Wichita, Kansas—the same city where they ultimately apprehended
Renteria.

Renteria testified that he did not
know the vehicles he had sold at the flea market to Sanchez and Saucedo were
stolen, but that he had obtained those vehicles from Romero and Nieto.  He testified that he sold a couple of trucks
for the two of them and that in June 2002 he began asking questions because they
had marketed the trucks for low amounts. 
He testified that he did not receive satisfactory answers, so he stopped
selling trucks for them.  Renteria
testified that he disliked Filomeno and never worked with him selling
trucks.  Renteria denied knowing
Rodriguez or ever speaking to him. 
Renteria denied ever going to the house on Heatherbrook.  Renteria testified that he did not have a license
to buy and sell vehicles and that he never paid taxes on the profits of the
vehicles he sold.  

Investigators discovered a
fingerprint on the back of a mylar sticker that had been removed from a salvage
vehicle and placed on one of the stolen vehicles.  Fingerprint expert Todd McCrohan testified
that he removed the fingerprint from the mylar sticker, compared it to a known
fingerprint in the fingerprint database and to a fingerprint taken from Renteria
in the courtroom, and determined that the fingerprint on the mylar sticker
belongs to Renteria.  McCrohan also
testified that he identified one of Rodriguez’s fingerprints on another mylar
sticker.  Cantu testified that someone’s
fingerprint could appear on the back of a mylar sticker only if that person had
removed the sticker and handled it in some way. 


The investigators did not witness any
criminal activity at Renteria’s residence. 
Kucifer also testified that no direct link existed between Renteria and
the house on Heatherbrook.  Kucifer
conceded that he had not produced any evidence that Renteria actually had
stolen any of the twelve vehicles that he discussed in detail at the
trial.  Kucifer testified that Ramiro
told investigators he purchased salvage vehicles for Renteria.  Kucifer and Cantu both testified that auto
theft rings involve much more than merely stealing and selling the cars, such
as alteration of the stolen cars and procurement and disposal of the salvage
vehicles.  

Legal Sufficiency

          In
his first issue, Renteria contends the evidence is legally insufficient to
demonstrate (1) that he intended to participate in a criminal combination, and
(2) that the group agreed to participate in a continuing course of criminal
activity.  

Standard of Review

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319,
99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175 S.W.3d 795, 798 (Tex.
Crim. App. 2005).  The standard is the
same for both direct and circumstantial evidence cases.  King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995).  We do not
resolve any conflict of fact, weigh any evidence, or evaluate the credibility
of any witnesses, as this was the function of the trier of fact.  See Adelman v. State, 828 S.W.2d 418,
421 (Tex. Crim. App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim.
App. 1991).  Instead, our duty is to
determine whether both the explicit and implicit findings of the trier of fact
are rational by viewing all the evidence admitted at trial in the light most
favorable to the verdict.  See Adelman,
828 S.W.2d at 421–22.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.

Engaging in Organized Criminal
Activity

          A
person engages in organized criminal activity “if, with
the intent to establish, maintain, or participate in a combination or in the
profits of a combination, . . . he commits or conspires to commit” one of
several enumerated offenses, including theft.  Tex.
Pen. Code Ann. § 71.02(a)(1) (Vernon Supp. 2005).  The State has the burden of proving the
combination.  Hart v. State, 89
S.W.3d 61, 63 (Tex. Crim. App. 2002).  A
“combination” requires three or more people who collaborate in carrying on criminal activities.  Tex. Pen. Code Ann. § 71.01(a)
(Vernon 2003).  The State must prove (1) that
the defendant intended to establish, maintain, participate in, or participate
in the profits of a combination, and (2) that the members of the combination
intended to work together in a continuing course of criminal
activity.  Hart, 89 S.W.3d at 63; Dowdle
v. State, 11 S.W.3d 233, 236 (Tex. Crim. App. 2000).  Participants in the combination need not know each other’s identity, and
membership in the combination may change.  Tex.
Pen. Code Ann. § 71.01(a)(1)–(2).  However, there must be evidence of an agreement
to act together in a continuing course of criminal activity.  Nguyen
v. State, 1
S.W.3d 694, 697 (Tex. Crim. App. 1999).  Similar methods of operation, together with joint activities and
relationships, support the finding of a single conspiracy.  McGee v. State, 909 S.W.2d 516, 518
(Tex. App.—Tyler 1995, pet. ref’d).  A
jury may infer criminal intent from any facts that tend to prove its existence,
including the acts, words, and conduct of the accused, and the method of
committing the crime.  Manrique v.
State, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).  

Here, the jury charge included an
instruction on the law of parties.  A
person is “criminally responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another for which he is
criminally responsible, or by both.”  Tex. Pen. Code Ann. § 7.01(a) (Vernon
2003).  A person is criminally
responsible for an offense committed by another if, “acting with intent to
promote or assist the commission of the offense, he solicits, encourages,
directs, aids, or attempts to aid the other person to commit the offense.”  Id. § 7.02(a)(2).  “Each party to an offense may be charged with
commission of the offense.”  Id. § 7.01(b).  To prove the offense of engaging in organized
criminal activity as a party, the State must also prove
that the defendant had the mental state required for commission of the
underlying offense.  Hart, 89
S.W.3d at 63.  The underlying offense
charged in this case was theft.  Theft is
committed when a person “unlawfully appropriates property with intent to
deprive the owner of property.”  Tex. Pen. Code Ann. § 31.03(a) (Vernon Supp. 2005).

Renteria’s Mens Rea

          Renteria
first contends the evidence is legally insufficient to demonstrate that he
intended to participate in a criminal combination.  Cerillo Sanchez and Alfredo Saucedo testified
that Renteria sold them stolen vehicles at the flea market sometime in
2002.  Renteria admitted to having sold
trucks at a flea market in 2002, and specifically to having sold a truck to
Saucedo.  Renteria contends, however,
that he did not know the vehicles were stolen when he sold them, and that he therefore
lacked the intent necessary to support his conviction.  Renteria contends this case is similar to Munoz
v. State, in which the Amarillo Court of Appeals reversed a conviction for
engaging in organized crime because the evidence indicated that Munoz was
involved in one drug transaction, but was legally insufficient to demonstrate
that he intended to participate in an ongoing course of criminal activity.  29 S.W.3d 205, 210 (Tex. App.—Amarillo 2000,
no pet.).  This case is distinguishable,
however, because here, evidence exists from which a reasonable jury could infer
that Renteria intended to engage in an ongoing course of criminal
activity.  

The State presented evidence that
Renteria purchased around thirty salvage vehicles from Ramiro and that the VINs
from those vehicles were later discovered attached to stolen vehicles that had
been sold at the flea market.  Filomeno
testified that he worked for Renteria for one month cleaning and selling
vehicles at the flea market and that he witnessed Renteria removing VINs from
some of those vehicles.  Filomeno also
testified that Renteria paid rent and worked out of the house on Heatherbrook
where Kucifer and Cantu discovered tools, hair dryers, and paint cans, all
associated with VIN switching.  In
addition, Renteria’s fingerprint was found on the back of a mylar sticker that
had been removed from a salvage vehicle and placed on a stolen vehicle.  Kucifer testified that a person’s fingerprint
could show up on the back of such a sticker only if the person had removed and
handled the sticker in some way.  Viewed
in the light most favorable to the verdict, we hold that this evidence is legally sufficient for a rational jury
to have concluded that Renteria intended to, and did, participate in a combination that collaborated in carrying on criminal activities through stealing, altering, and selling
vehicles.

          Group
Mens Rea

          Renteria
further contends the evidence is legally insufficient to demonstrate that the
alleged members of the combination intended to engage in a continuing course of
criminal activity.  See Nguyen, 1 S.W.3d at 697.  Renteria’s indictment identifies the alleged
members of the combination as Renteria, Rodriguez, Opondo, Barrera, Ponce,
Aragon, Jose Adame, Angel Adame, and Nieto. 
Renteria contends Nieto, Angel Adame, Rodriguez, Filomeno, and Renteria
were the only individuals discussed with enough specificity at trial to have
arguably been members of the combination, and thus the State failed to prove
the combination as alleged.  Texas Penal
Code section 71.01(a) requires the participation of three individuals to prove
a combination, so the State must prove three of the
individuals named in the indictment committed or conspired to commit theft as
part of an ongoing course of criminal activity.  See Tex.
Penal Code Ann. § 71.01(a).  Thus,
evidence linking at least two of the named co-conspirators and Renteria to the
auto theft ring is sufficient to support Renteria’s conviction under the
statute.  Id.; see Fuller v. State, 73
S.W.3d 250, 252, 254 (Tex. Crim. App. 2002) (federal constitutional law
measures evidentiary sufficiency against the “elements of the criminal offense
as defined by state law,” and state law measures
evidentiary sufficiency against an “authorized by the indictment . . . hypothetically
correct jury charge” that “encompasses [the] statutory elements of the offense
as modified by the charging instrument”).

          Kucifer
and Cantu linked 136 vehicles—all trucks with similar descriptions—to the auto
theft ring.  The vehicles were stolen,
altered, and discovered within a two-year period spanning 2001 to 2003.  The investigators testified that by
information obtained through creating lists of individuals who had purchased
salvage vehicles, interviewing the purchasers of the stolen vehicles, and
searching the residences of various suspects, they determined that the
individuals named in the indictment participated in the auto theft ring. 

          1.
Nieto 

The purchaser of one of the stolen
vehicles told investigators that Nieto had sold him the car.  Cantu and Kucifer went to Nieto’s house and
found a stolen vehicle matching the description of those involved in the auto
theft ring for sale in his driveway.  Cantu and Kucifer searched Nieto’s house and
discovered a Ford ignition switch, a registration receipt for another stolen
vehicle, and the driver’s license of the owner of yet another stolen vehicle.  Ramiro testified that he began purchasing
salvage vehicles for Nieto after he saw Nieto conversing with Renteria and
Rodriguez at the auctions and determined they were all part of a group.  Viewed in a light most favorable to the
verdict, we hold that this evidence is sufficient to demonstrate Nieto’s
involvement in the combination.

2. Rodriguez

Ramiro testified that he purchased
about thirty salvage vehicles for Renteria and Rodriguez.  Spates testified that Rodriguez paid him $100
to store three or four salvage vehicles in his junkyard.  Kucifer and Cantu testified that they
discovered on Spates’s property forty-three salvage vehicles whose VINs had
been removed and reattached to stolen vehicles associated with the combination.  Filomeno testified that he cleaned vehicles
for Renteria and Rodriguez at a residence on Heatherbrook, and witnessed
Renteria and Rodriguez removing VINs from vehicles while cleaning cars at that
residence.  Cantu and Kucifer testified
that they searched the Heatherbrook residence and discovered tools, a hair
dryer, and spray paint, all of which they believed, based on their experience,
would commonly be used to remove and reattach VINs and mylar stickers.  Kucifer and Cantu testified that while
conducting surveillance on Ponce’s house, they observed Rodriguez arrive in a
stolen vehicle associated with the auto theft ring, have a brief conversation
with Ponce, and leave.  That stolen
vehicle was later recovered in Wichita, Kansas, which is also where police
apprehended Renteria.  Armando Garcia
testified that he purchased a 1997 extended cab Ford truck, later determined to
be stolen, from Rodriguez at the flea market. 
Rene Sanchez testified that Rodriguez sold him a stolen black Ford truck
at a flea market in April 2002.  Viewed
in a light most favorable to the verdict, we hold that this evidence is
sufficient to demonstrate Rodriguez’s involvement in the combination.  

3. Angel

Filomeno testified that his brother
Angel used to live in the house on Heatherbrook, but that when Angel decided to
move, Renteria offered to continue to pay the rent so Renteria could prepare
stolen trucks for sale there.  When
Kucifer and Cantu searched the house on Heatherbrook, it was still rented under
Angel’s name, and investigators discovered mail there bearing Angel’s
name.  Ramiro testified that he saw Rodriguez,
Renteria, Nieto, and Angel together at the auctions, and that he purchased
vehicles for all of them on occasion because he believed them to be part of the
same group.  Eva Renteria testified that
she saw Filomeno and Angel driving different trucks every week.  Viewed in a light most favorable to the
verdict, we hold that this evidence is sufficient to demonstrate Angel’s
involvement in the combination.  

4. Renteria

Filomeno testified that Renteria paid
him to sell about ten trucks at the flea market over a period of about one
month.  He also testified that he helped
Renteria and Rodriguez clean the trucks to prepare them for sale at the house
on Heatherbrook where Angel used to live, but where Renteria had begun paying
rent.  Cantu and Kucifer testified that
they searched the Heatherbrook residence and discovered tools, a hair dryer,
and spray paint, all of which they believed, based on their experience, would
commonly be used to remove and reattach VINs and mylar stickers.  Filomeno testified that he saw Renteria and
Rodriguez removing VINs from vehicles while cleaning cars at that
residence.  Ramiro testified that he
purchased about thirty salvage vehicles for Renteria and Rodriguez at auction.  Ramiro later identified Renteria, Rodriguez,
Angel, and Nieto out of a photo line-up. 


We hold that this evidence is legally
sufficient to show that, at the very least, Renteria, Rodriguez, Angel, and
Nieto worked together in an ongoing course of criminal activity.

Election

          In
his second issue, Renteria contends the trial court erred in denying his
request to require the State to elect a single paragraph in the charge on which
to proceed.  The indictment in this case
charges that Renteria,

on or about various dates between April 26, 2001 and
April 21, 2003, pursuant to one scheme and continuing course of conduct, did
then and there unlawfully, with intent to establish, maintain, and/or
participate in a combination and in the profits of a combination . . . commit
the offense of theft by acquiring or otherwise exercising control over property
with the intent to deprive the owner of that property, and the total value of
the property was over two hundred thousand dollars.

 

The next paragraph of the indictment alleges
that, “as part of the above identified combination, the Defendant acquired or
otherwise exercised control over 136 motor vehicles,” and the final paragraph
alleges that, “as part of the above-identified combination, the Defendant acquired
or otherwise exercised control over money.” 
The State contends the two allegations, theft of motor vehicles and
theft of money, are two separate means of committing the same offense—organized
criminal activity—and do not constitute two separate offenses requiring an
election by the State.  We agree.  

          Upon
a timely motion by the defendant, the State is required to make an election of
those alleged acts upon which it will rely to pursue a conviction.  Gutierrez v. State, 8 S.W.3d 739, 748
(Tex. App.—Austin 1999, no pet.).  This
election requirement only applies, however, if an indictment alleges a single
offense and the proof at trial shows the alleged offense occurred more than
once.  See Scoggan v. State,
799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990); Moore v. State, 143
S.W.3d 305, 312 (Tex. App.—Waco 2004, no pet.). 
The State is not required to elect between separate manners and means of
committing the same offense.  Rodriguez
v. State, 970 S.W.2d 66, 69 (Tex. App.—Houston [14th Dist.] 1998, pet. ref’d)
(“The State may plead all three forms of delivery [of cocaine] and it may not
be forced to elect a particular method on which to prosecute.”); Braughton
v. State, 749 S.W.2d 528, 530 (Tex. App.—Corpus Christi 1988, pet. ref’d)
(“The State need not elect between various theories alleged and the jury may
consider all theories and return a general verdict of guilty.”).

Renteria relies on O’Neal v. State,
for the proposition that “once the State rests its case in chief, in the face
of a timely request by the defendant, the trial court must order the
State to make its election.  746 S.W.2d
769, 772 (Tex. Crim. App. 1988).  Failure
to do so constitutes error.”  This court
considered an argument similar to Renteria’s in Renfro v. State, 827
S.W.2d 532, 535–36 (Tex. App.—Houston [1st Dist.] 1992, pet. ref’d).  In that case, Renfro was charged with
engaging in organized criminal activity by collaborating with other individuals
to commit “theft of vehicles, heavy equipment, and money.”  Id. at 535.  In eight separate paragraphs, the indictment
alleged eight incidents involving theft of heavy equipment and vehicles, each
involving Renfro and various members of the group.  Id. 
Renfro argued that the jury charge, which contained the same eight
paragraphs from the indictment, failed to adequately apprise him of which
offense he had been convicted, and with which members of the combination he had
allegedly participated.  Id.  We held that “[i]n the indictment, the
language ‘theft of vehicles, heavy equipment and money’ did not allege three
different offenses, but simply described the purpose of the combination, i.e.,
to collaborate in carrying on the criminal activity of theft targeting heavy
equipment, vehicles, and money.”  Id.
at 536.  “The fact that the State alleged
in the indictment the three types of property targeted to be stolen did
not convert the offense of engaging in organized crime to commit theft into
three separate offenses.”  Id.   

Similarly, here, Renteria was charged
with the single offense of engaging in organized criminal activity under
section 71.02 by participating in a criminal combination and committing theft.  See Tex.
Pen. Code Ann. § 71.02(a)(1).  The
indictment alleged in two paragraphs that Renteria participated in stealing 136
vehicles, and in selling the stolen vehicles to 136 innocent purchasers.  The fact that the State alleged two types of
theft did not convert the offense of organized crime into two separate
offenses.  Renteria suggests that because
the State alleged two modes of committing the offense, he cannot be sure under
which mode—theft of cars or theft of money—the jury found him guilty.  However, the Court of Criminal Appeals
recently held that while jury unanimity is required on the essential elements
of the offense, if the statute in question establishes different modes or means
by which the offense may be committed, unanimity is generally not required on
the alternate modes or means of commission.  Jefferson v. State, 189 S.W.3d 305, 311
(Tex. Crim. App. 2006).  Accordingly, we
hold the trial court did not err in denying his request to require the State to
elect between the two paragraphs in the indictment.

Conclusion

          We
conclude that the evidence is legally sufficient to support Renteria’s
conviction for engaging in organized criminal activity.  We further conclude that the trial court did
not err in denying his request to require the State to elect between the two
means of committing the crime of engaging in organized criminal activity.  We affirm the judgment of the trial court.

 

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Justices Keyes,
Alcala, and Bland.

Publish.  Tex. R. App. P. 47.2(b).