# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00668-CR

**Charles Newman Smith, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BURNET COUNTY, 424TH JUDICIAL DISTRICT NO. 42388, HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

## O P I N I O N

Charles Newman Smith, Jr., was charged with engaging in organized criminal activity by conspiring with several people to commit the offense of "unlawful delivery, dispensation, or distribution of a controlled substance, namely: four grams or more but less than 200 grams of Methamphetamine." *See* Tex. Penal Code § 71.02(a)(5) (setting out elements of offense of engaging in organized criminal activity); Tex. Health & Safety Code § 481.112(a), (d) (governing offense of delivery of controlled substance and providing that offense is first-degree felony if amount of controlled substance was four grams or more but less than 200 grams). At the end of the guilt-or-innocence phase of the trial, the jury found Smith guilty of the offense. At the end of the punishment phase, the jury recommended that Smith be sentenced to twenty-five years' imprisonment. *See* Tex. Penal Code § 71.02(b) (explaining that, in general, offense level of engaging in organized criminal activity "is one category higher than" underlying criminal offense committed); *see also id.* § 12.32(a)

(listing permissible punishment range for first-degree felony). The district court rendered its judgment in accordance with the jury's verdicts. In two issues on appeal, Smith challenges the sufficiency of the evidence supporting his conviction and contends that the district court erred by failing to give a unanimity instruction. We will affirm the district court's judgment of conviction.

**BACKGROUND**

The indictment in this case alleged that "pursuant to a common scheme or continuing course of conduct" and "with the intent to establish, maintain, or participate in a combination or in the profits of a combination," Smith collaborated to commit the offense of unlawfully delivering, dispensing, or distributing methamphetamine in an amount between four and 200 grams. The indictment specified that the combination consisted of Smith and "Nebes Montemayor, Guillermo Reyna, Abel Cardoso, Jimmy Hardin, Amy Borseth, Glen Alexander, Timothy Blackard, Joy Perez, Elizabeth Burch, Christopher Castillo, Cheri Gibbs, Kimberly Weston, Gina Magdaleno, and Charles Davidson, Jr."

This case originated from an extensive investigation of Hardin, which was undertaken by various State and federal agencies over a period of several months. The agencies suspected that Hardin was the center of a drug-trafficking operation involving several people. As part of the investigation, the agencies monitored Hardin's home to see who would visit the home and how often, and the agencies also monitored Hardin's phone calls and "utilized informants to make purchases" of methamphetamine from Hardin. Two of the individuals that were recorded either calling Hardin or receiving calls from Hardin were Smith and his girlfriend Cindy Brinkley. After listening to phone calls in which potential drug exchanges were discussed, various law-enforcement personnel

2

would sometimes initiate traffic stops of the individuals who had driven to Hardin's house or met him at another location in an effort to verify that a drug exchange had occurred or was about to.

Although Smith challenges much of the evidence pertaining to him personally, neither party disputes that the evidence presented during the trial established the following:

- An ounce is equivalent to twenty-eight grams and that an eightball is an eighth of an ounce of methamphetamine, which is also three-and-a-half grams;

- Hardin was at the center of a criminal enterprise in which he sold fifteen to twenty ounces of methamphetamine per week and that he sold to over 80 people who were identified through the wiretaps of his phone;

- Although over 80 people were identified through the wiretaps, the police only investigated those individuals who purchased more than three-and-a-half grams;

- Hardin received methamphetamine from at least the following two individuals: Reyna, who was Hardin's primary source, and Cardoso, who was Hardin's secondary source;

- Borseth was romantically involved with Hardin, lived with him, and helped him sell drugs;

- Blackard worked with Hardin as Hardin's enforcer, distributed drugs when Hardin needed him to, and facilitated drug transactions;

- Alexander stored weapons and drugs at his workshop for Hardin and allowed drug transactions to occur at the workshop;

- Montemayor acted as an interpreter for Reyna when Reyna would travel to meet with his distributors in the United States, and Hardin was recorded asking Montemayor for between ten and twenty ounces of methamphetamine;

- Hardin was recorded asking to buy five ounces of methamphetamine from Cardoso, and the police initiated a traffic stop of Cardoso after listening to this call and found over 137 grams of methamphetamine, which is almost five ounces;

3

- Weston, who is Blackard's wife, purchased methamphetamine from Hardin on behalf of David Milam on several occasions in amounts ranging from half of an ounce to an ounce and was arrested after the police initiated a traffic stop and found over 56 grams of methamphetamine;

- The police initiated a traffic stop of Castillo after he left Hardin's home, and the police found over 251 grams of methamphetamine; and

- The police initiated a traffic stop of Burch after observing her interactions with Hardin and recovered over twenty-seven grams of methamphetamine.

During the trial, various law-enforcement officers were called to the stand to discuss their investigation, including the extensive surveillance that was performed, the phone calls that were recorded, and the testing that was performed on substances collected from various individuals, and the State also called Brinkley and Weston to the stand. When presenting his case, Smith called his sister, Carrie Foster, and his friend, Karen Milder, to the stand. After listening to all of the evidence presented, the jury determined that Smith was guilty of the crime alleged.

## DISCUSSION

### Sufficiency of the Evidence

In his first issue on appeal, Smith does not contend that there is insufficient evidence to establish that a drug-trafficking scheme was in effect that centered around Hardin, but he contends that "[t]he evidence is legally insufficient to support that [he] engaged in organized criminal activity." When challenging the sufficiency of the evidence, Smith asserts that "the State failed to prove that with intent to establish, maintain, or participate[] in a combination or profits of a combination, [he] participated in the distribution and sale of narcotics." In particular, Smith urges that "[t]he State failed to prove that [he] engaged in any combination with any of the indicted actors" and that if the

4

evidence proves that he is guilty of anything, "he is guilty of purchasing meth for his own personal use."[1] Further, Smith notes that the State "never found large amounts of cash or drugs and did not find any sort of evidence that would indicate Smith was a dealer, such as, Baggies, ledger, or a scale." Similarly, Smith highlights that in performing its investigation, the State never searched him, his house, or his car. Finally, Smith contends that the State failed to produce any evidence showing that he was "a dealer" other than the testimony of his girlfriend, Brinkley, who was also an alleged accomplice.

Under the Penal Code, a person commits the offense of engaging in organized criminal activity if, among other ways, "with the intent to establish, maintain, or participate in a combination or in the profits of a combination . . ., the person commits . . . one or more of" the enumerated offenses, including "unlawful . . . delivery, dispensation, or distribution of a controlled substance or dangerous drug."[2] Tex. Penal Code § 71.02(a)(5). Further, the Penal Code defines a

[1] During the trial, Foster and Milder both testified that Smith had a severe addiction to methamphetamine that had lasted for decades, and Milder testified that Smith was not a dealer. Similarly, Brinkley testified that Smith consumed a large amount of methamphetamine per day and that she did not consider Smith to be a dealer. When describing Smith's consumption of methamphetamine, Brinkley related that Smith used a lot, but she also stated that the most she had ever seen anyone use in a day was between one and one-and-a-half grams. However, as set out later in the opinion, evidence was also introduced showing that Smith sold and delivered methamphetamine. Where, as here, there are contradictory inferences from the evidence, we must presume that the jury resolved those conflicts in favor of the verdict and defer to the jury's resolution. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wilcox v. State*, No. 03-01-00731-CR, 2003 WL 1338202, at \*1 (Tex. App.—Austin Mar. 20, 2003, pet. ref'd) (mem. op., not designated for publication) (explaining that "[t]he jury is free to reject or accept any or all of the evidence presented by either party").

[2] The Penal Code specifies that a person can also be guilty of the offense if the person "conspires to commit one or more" of the listed crimes. Tex. Penal Code § 71.02(a). However, in this case, rather than assert that Smith committed *or* conspired to commit the offense of unlawful delivery, dispensation, or distribution, the indictment only alleged that Smith *committed* the offense.

5

"combination" as "three or more persons who collaborate in carrying on criminal activities" and explains that the "participants may not know each other's identity," that "membership in the combination may change from time to time," and that "participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations." *Id.* § 71.01(a). Regarding "profits," the Code states that they are "property constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in Section 71.02." *Id.* § 71.01(c).

To satisfy the combination element, the State must prove that there was "an agreement to act together in [a] continuing course of activity." *See Ledet v. State*, 177 S.W.3d 213, 219 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see also Munoz v. State*, 29 S.W.3d 205, 208 (Tex. App.—Amarillo 2000, no pet.) (emphasizing that State must show "that the *accused intended* to establish, maintain, or participate in a group of three or more" and "that the members of the *group intended* to work together in a continuing course of criminal activities"). An agreement among a group "to work on a common project" may be inferred when each person's action is consistent with realizing "the common goal." *McGee v. State*, 909 S.W.2d 516, 518 (Tex. App.—Tyler 1995, pet. ref'd); *see* Tex. Penal Code § 71.01(b) (providing that "[a]n agreement constituting conspiring to commit may be inferred from the acts of the parties"). Moreover, "even a single criminal offense can support a conviction" because "it is not the number of criminal actions that is determinative but whether the intent to engage in continuous criminal activities was shown." *Arredondo v. State*, 270 S.W.3d 676, 683 (Tex. App.—Eastland 2008, no pet.); *see Bogany v. State*, 54 S.W.3d 461, 463 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (explaining that organized-crime statute "does not require proof of a continuing series of criminal acts or violations" and that "[t]he only criminal act that must be proved is the commission of, or conspiracy to commit, one of the specified crimes");

6

*Garcia v. State*, 46 S.W.3d 323, 327 (Tex. App.—Austin 2001, pet. ref'd) (stating that "[t]he critical element of a criminal conspiracy is the agreement among the conspirators to commit the criminal offense"); *see also Adams v. State*, 40 S.W.3d 142, 144 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (explaining that State must prove "intended continuity" and that evidence of agreement to jointly commit single criminal act does not suffice); *Smith v. State*, 36 S.W.3d 908, 910 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (stating that "[c]ontinuity implies something more than a single *ad hoc* effort"); *Munoz*, 29 S.W.3d at 208 (internal citation omitted) (providing that "the continuing course of criminal activity referred to must encompass more than one crime or criminal episode"). "In proving the existence of a combination, the State need not demonstrate the participation of all alleged members of the combination; the State need only prove the participation of at least three of the named members of the combination." *Rodriguez v. State*, 90 S.W.3d 340, 354 (Tex. App.—El Paso 2001, pet. ref'd).

To show a violation, "[t]he State is required to prove that the defendant committed the predicate offense with the specific intent to participate in or facilitate a combination." *Id.* "Intent can be inferred from acts, words, and conduct of the accused" as well as the circumstances in which the defendant's actions occurred. *DeLeon v. State*, 77 S.W.3d 300, 312 (Tex. App.—Austin 2001, pet. ref'd). "Further, in order to prove the defendant's intent to participate in a combination, the State must prove not only that the defendant knew of the existence of the combination, but also that the defendant knew of the criminal activity of the group." *Rodriguez*, 90 S.W.3d at 354.

Under a legal-sufficiency standard of review, appellate courts view the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found

7

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). When performing this review, an appellate court must bear in mind that it is the factfinder's duty to weigh the evidence, to resolve conflicts in the testimony, and to make reasonable inferences "from basic facts to ultimate facts." *Id.*; *see also* Tex. Code Crim. Proc. art. 36.13 (explaining that "jury is the exclusive judge of the facts"). Moreover, appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and defer to that resolution. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, courts must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Furthermore, reviewing courts "measure the sufficiency of the evidence by the so-called hypothetically correct jury charge, one which accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *See DeLay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320).

As set out above, Smith complains that the only evidence presented during the trial establishing his guilt of the predicate offense came from Brinkley, who was an alleged accomplice and who agreed to enter a plea of guilty to the crime of engaging in organized criminal activity and to testify for the State in cases involving members of the alleged combination in exchange for the State recommending that she be sentenced to five years' imprisonment. "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. art. 38.14; *see also Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999) (noting that "[a] person is an accomplice if he participates before, during, or after the commission of the crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense"). "When reviewing the sufficiency of non-accomplice evidence under article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *see Roys v. State*, 416 S.W.3d 229, 234 (Tex. App.—Amarillo 2013, pet. ref'd). In performing this analysis, "the reviewing court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The non-accomplice evidence is viewed "in the light most favorable to the verdict," *Knox v. State*, 934 S.W.2d 678, 686 (Tex. Crim. App. 1996), and it "need not directly link the defendant to the crime" or "'establish his guilt beyond a reasonable doubt,'" *Roys*, 416 S.W.3d at 234 (quoting *Castillo*, 221 S.W.3d at 691). Although "the accused's mere presence in the company of the accomplice before, during, and after the commission of the

9

offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration." *Id.* "[T]he tends-to-connect standard does not present a high threshold." *In re C.M.G.*, 905 S.W.2d 56, 58 (Tex. App.—Austin 1995, no writ).

In her testimony, Brinkley explained that she entered into an agreement with the State in which the State would recommend a lower sentence in exchange for her testimony and further admitted that she had previously committed several felonies, including involuntary manslaughter and forgery, had been incarcerated on two prior occasions, and had used methamphetamine "[o]ff and on" for years. When describing her past criminal history, Brinkley said that she had "22 pages of criminal history." In addition, she admitted that she had lied in the past, and she also said that she would do anything to stay out of prison that was reasonable and legal but insisted that she would not "lie though." Further, during her testimony, she also admitted to buying methamphetamine from Hardin and to delivering it to her boss and to other people. When discussing the time that she purchased methamphetamine and then delivered it to her boss, she related that she called Hardin, that Hardin seemed to say that he did not have much in supply at the moment, that she later went to Hardin's home after he was able to restock his supply, that she obtained an ounce of methamphetamine, and that she later delivered three-quarters of an ounce to her boss. In addition, she testified that Smith was with her when she went to Hardin's house on that occasion and several other times.

Regarding Smith's unlawful delivery, dispensation, or distribution of methamphetamine, Brinkley recalled that on the same day that she asked for an ounce to deliver to her boss, Smith also asked Hardin for and ultimately received three-quarters of an ounce. Further, she explained that she and Smith would buy methamphetamine from Hardin "quite often" and "[a]t least once a week" and that they would usually just buy "ounces" "or half-ounces, or quarter-ounces, or whatever." Moreover, she related that she witnessed Smith deliver methamphetamine to a woman named Shannon Zieschang, that he made "[a] lot" of deliveries to Zieschang, and that Smith bought ounces in order to deliver them to Zieschang. When describing how often and how much Smith sold to Zieschang, Brinkley testified that Smith sold to Zieschang over a period of months and that "the majority of whatever [he bought] would go to" Zieschang. In discussing the transactions, Brinkley explained that Smith would bring the whole ounce to Zieschang's home, that Zieschang would "break off whatever it is she wanted" and take "like a gram or two," and that Smith would charge Zieschang "an extra $100 or something so he could make something off of it and then he would have, you know, personal stuff and money."

During the trial, evidence was presented corroborating Brinkley's testimony regarding Smith's involvement in the delivery or distribution of methamphetamine through the testimony of various law-enforcement personnel and through the admission of recordings of conversations between Smith and Hardin.[3] In one recording of a phone call that was played for the jury, Brinkley

_____

[3] In the trial, recordings of conversations between Hardin and Brinkley were also played for the jury. On those recordings, Brinkley indicated that she wanted to make a purchase of methamphetamine, and Hardin told Brinkley that he would call her when he had some to sell and later told Brinkley to come over to his house after a new supply had arrived.

11

told Hardin that she wanted to buy an ounce for her boss and then handed the phone to Smith, and Smith asked for "three quarters" for $750. On the recording, Hardin agreed to the terms and told Smith and Brinkley where to meet him. During a subsequent call, Smith asked if he could swing by "and see you if that's cool" because he wanted a "whole one," but Hardin explained that he "ain't got nothing" at that moment other than a "G," that he was "gonna call them people right now," and that he would call Smith back afterwards. In a later call, Hardin told Smith that his "dude ran out on me, I'm fixin to go check somebody else out right now," and Smith asked Hardin to "[h]oller when you get some alright." Moreover, other recordings of later conversations were played for the jury in which Hardin told Smith that he "got it" and in which Smith responded by saying that he would head for Hardin's house right away. Another set of recordings was played in which Brinkley stated that she was in the room with Smith, in which Hardin asks Brinkley if she wants "a whole one," in which Brinkley asks Smith if he wants a whole one, in which Brinkley later answers affirmatively to Hardin, and in which Smith later tells Hardin after they met up that the amount he received "is one [and] a half short."

In addition to the recordings summarized above, Officer William Reuter was called to the stand to discuss, among other topics, the context in which those calls were made and the reasons why law enforcement elected to investigate individuals who purchased three-and-a-half grams or more from Hardin. In his testimony, Officer Reuter explained that he had been a narcotics investigator for over twenty years and that he typically investigated "major drug trafficking organizations." Further, he testified that drug dealers and purchasers will often communicate through code in order to discuss drug transactions without using the actual words in case the phone call was

12

being monitored by law enforcement. For example, Officer Reuter explained that when Hardin told a caller to "come on over" or "I got you," it meant that he had drugs available; that when Hardin told Smith that he only had a "G," he meant that he only had "a gram of methamphetamine left"; and that when Hardin, Smith, and Brinkley talked about a "whole one," they were referring to an ounce of methamphetamine. Further, Officer Reuter related that the meanings of the code words and the short-hand references to amounts were corroborated by "the surveillance and the traffic stops that we were able to conduct" after people made purchases from Hardin.

When discussing the various recordings and the context in which those calls were made, Officer Reuter testified that Brinkley asked to buy an ounce of methamphetamine, that Brinkley then handed the phone to Smith, and that Smith then asked for three quarters of an ounce or twenty-one grams for $750. When describing the phone call in which Hardin stated that he "got it," Officer Reuter explained that the conversation was a follow-up to the prior conversation in which Smith asked Hardin to call him when he received a new supply of drugs. In the portion of Officer Reuter's testimony discussing the phone call in which Hardin said that he only had a "G" left, Officer Reuter emphasized that Smith did not ask to buy the gram, which Officer Reuter believed was inconsistent with the description of Smith as being someone who is highly addicted to methamphetamine because someone who is highly addicted "wouldn't turn anything down," and that Smith instead indicated that he would wait for a whole ounce, which Officer Reuter believed was consistent with someone who was a dealer. He also explained that when Hardin informed Smith that his "dude had skipped out on him," Hardin's main source, Reyna, had disappeared and that Hardin was looking for another source.

13

Further, Officer Reuter explained that a "distributable amount" is "an eightball," which is "three-and-a-half grams of methamphetamine." Moreover, he explained that this cut-off amount was based on the knowledge that he obtained by debriefing distributors about patterns of drug dealing and usage. In addition, he stated that based on his experience, if someone buys three-and-a-half grams, the person has "the opportunity to sell some, use some, and the amount that's sold will help them buy more."[4] Officer Reuter testified that purchasing three-and-a-half grams is "quite a bit" but admitted that he did not know if it would be an unusual amount to buy for personal consumption because that "depends on how much the person uses."

When discussing the amounts that Smith was purchasing, Officer Reuter agreed that it would be unusual to buy three-quarters of an ounce or an ounce for personal use and explained that if someone says they will pay $750 or $850 for methamphetamine, that usually means he is "selling to supply [his] habit" and that for someone who is just using, he would likely buy some every day because he would not "have enough money to buy a large amount." Further, Officer Reuter stated that someone who is purchasing three-quarters of an ounce or an ounce and who is reselling that large of an amount will break the amount up and charge a higher rate. For example, he testified that if someone buys three-quarters of an ounce and then sells it by the gram, he could collect "$2,100 roughly," which he agreed was a large profit over the purchase price of $750. In addition, Officer Reuter related that people who use methamphetamine do not want a large amount around their house because the chances of it "getting stolen are pretty good." Similarly, in relation to a seizure made

---

[4] Consistent with Officer Reuter's testimony, Brinkley explained that if she ever bought "an eight ball," she "would probably sell a couple of grams to make up the money for it and then do the rest."

14

after a traffic stop of Burch, Sheriff William Fritsch testified that an ounce of methamphetamine is a large amount and explained that the amount was more likely for "resale" than for "personal use."

In light of this evidence presented at trial, we must conclude that sufficient evidence was introduced tending to connect Smith to the predicate offense and corroborating Brinkley's testimony. *See Knox*, 934 S.W.2d at 686-87; *Roys*, 416 S.W.3d at 234. In particular, the recordings of Hardin's phone calls with Smith demonstrate that on more than one occasion Smith asked to purchase either three-quarters of an ounce or a full ounce of methamphetamine, that Smith and Hardin made arrangements to meet to complete the transactions, and that Smith confirmed that at least one of the transactions occurred by later informing Hardin that he did not obtain the full amount that he requested. Moreover, the testimony from Officers Reuter and Fritsch both indicated that the large amounts purchased by Smith were more consistent with resale than for personal use. In fact, Officer Reuter explained that three-and-a-half grams, which is an eighth of an ounce, is an amount that could be purchased for distribution purposes.

Bearing in mind the reasonable inferences that the jury was free to make from all of the evidence and viewing the evidence in the light most favorable to the verdict, including the testimony from Brinkley that Smith bought methamphetamine from Hardin regularly, that Smith would buy between a quarter of an ounce to a full ounce, that the majority of what he bought was resold and distributed to Zieschang, and that Smith delivered methamphetamine to Zieschang often, we must also conclude that the evidence was legally sufficient to support a determination that Smith committed the predicate offense of unlawful "delivery, dispensation, or distribution" of methamphetamine in an amount between four and 200 grams. *See* Tex. Penal Code § 71.02(a)(5);

15

*see also* Tex. Health & Safety Code § 481.002(8) (defining "'[d]eliver'" as " to transfer, actually or constructively, to another a controlled substance, counterfeit substance, or drug paraphernalia, regardless of whether there is an agency relationship" and as including "offering to sell a controlled substance, counterfeit substance, or drug paraphernalia"), (14) (explaining that "'[d]istribute' means to deliver a controlled substance other than by administering or dispensing the substance.").

Regarding the combination element, we note that Smith does not dispute that the evidence established the existence of a combination involving Hardin and instead asserts that the evidence is insufficient to establish that Smith intended to be a part of the combination or participate in the profits of the combination.[5] As set out previously, the evidence established that Hardin sold between fifteen and twenty ounces of methamphetamine per week; that Hardin's suppliers were Reyna and Cardoso; that Borseth, Blackard, and Alexander aided Hardin in making various drug transactions and in storing the drugs; and that Hardin sold methamphetamine to Weston, Castillo, Burch, and others. In fact, Officer Reuter explained that through his investigation, he ultimately determined that there was a combination involving Montemayor, Reyna, Cardoso, Hardin, Borseth, Alexander, Blackard, Burch, Castillo, Weston, Magdaleno, Davidson, and Smith and that they were collaborating and engaging in criminal activity by delivering methamphetamine in an amount

---

[5] We note that rather than allege that the combination consisted of Smith and two or more of the following individuals, the indictment alleged that the combination consisted of Smith and all of the listed individuals. However, the jury charge specified that the combination consisted of Smith "and at least two of the following" people originally listed in the indictment. *Cf. Delay v. State*, 465 S.W.3d 232, 244 n.48 (Tex. Crim. App. 2014) (emphasizing that sufficiency reviews examine evidence in light of "hypothetically correct jury charge"); *Rodriguez v. State*, 90 S.W.3d 340, 354 (Tex. App.—El Paso 2001, pet. ref'd) (explaining that State only needs to prove participation by three people alleged to be in combination).

16

that was greater than four grams but less than 200 grams and that was greater than 200 grams in certain cases.

Moreover, the recordings and testimony from Officer Reuter established that Smith made arrangements to make several purchases of methamphetamine over a period of weeks. The recordings and the testimony from Officer Reuter also demonstrated that when Smith contacted Hardin on two occasions about purchasing methamphetamine, Hardin informed Smith that he was out of methamphetamine and that he promised to contact one of his suppliers to get more, and Smith repeatedly asked Hardin to contact him after receiving another supply. Further, those recordings and the testimony of Officer Reuter revealed that Hardin told Smith that he decided to contact another supplier when the first one was unavailable and that Hardin later told Smith that he had obtained a new supply.

When discussing the phone calls mentioned above, Officer Reuter explained that the calls revealed that there was a combination of at least four people, including Smith, Hardin, Reyna, and the other supplier that Hardin referenced, and he related that for combinations in drug cases, "[y]ou have the suppliers, you have the distributors, and people that would get distributable amounts to redistribute it." In addition, Officer Reuter testified that there was a continuing scheme to distribute methamphetamine and that the phone calls showed a plan to establish, maintain, or participate in a combination or the profits from a combination. Moreover, Brinkley testified that she and Smith bought methamphetamine from Hardin at least once a week and that the majority of what Smith bought was sold to Zieschang in a manner that would ensure that Smith obtained a profit from each sale. Similarly, Officer Reuter explained that if someone paid the prices that Smith did for the large

17

amounts at issue and then broke down the amount into smaller amounts for resale in the manner described by Brinkley, the person would be able to make a significant profit per purchase.

Viewing the evidence in the light most favorable to the verdict and bearing in mind the reasonable inferences that the jury was free to make from that evidence, we must conclude that the jury could have inferred that there was an agreement between Smith and at least two of the individuals named in the indictment to engage in a continuing course of criminal conduct involving the distribution of methamphetamine, that Smith was aware of the combination and of the criminal activity, and that Smith committed the offense of unlawful "delivery, dispensation, or distribution of" methamphetamine "with the intent to establish, maintain, or participate in" the combination "or in the profits of" the combination. *See* Tex. Penal Code § 71.02(a)(5). *Compare Williams v. State*, No. 11-12-00103-CR, 2014 WL 3865786, at *4 (Tex. App.—Eastland July 31, 2014, no pet.) (mem. op., not designated for publication) (finding evidence sufficient where police officer witnessed multiple drug transactions at defendant's home over course of more than one month, where surveillance footage showed activity consistent with drug dealing, where witnesses testified that defendant and others sold them drugs at defendant's house, where witness said she observed drug transactions at house and saw defendant divide cocaine with others, and where police found large amounts of cash), *Valley v. State*, No. 11-11-00042-CR, 2013 WL 3336614, at *2-5 (Tex. App.—Eastland June 27, 2013, no pet.) (mem. op., not designated for publication) (holding that evidence was sufficient to support determination that defendant acted in combination with Edward Lotz, Jack Baker, and Edgar Cruz to deliver methamphetamine where it showed that undercover officer attempted to purchase methamphetamine from Lotz, that Lotz said that he did not have any

18

drugs on him and made phone call to defendant, that defendant arrived at Lotz's home and handed Lotz bag containing methamphetamine after Lotz gave defendant money, that Lotz obtained drugs from defendant ten times over six months, that Jennifer Lawhorn purchased methamphetamine from defendant fifteen times over three months before being pulled over by police, that Baker sold half ounce of methamphetamine to defendant every day or every other day for six to eight months, and that Cruz was one of Baker's suppliers), *Mayfield v. State*, 906 S.W.2d 46, 49-51 (Tex. App.—Tyler 1995, pet. ref'd) (affirming conviction where testimony from undercover officer, video surveillance, and testimony from one of alleged dealers in group established, at minimum, that defendant assisted drug dealer in drug exchange for money, linked buyers with sellers in exchange for cut of drugs, knew location at which he could "replenish his supply of drugs," "knew which street sellers sold sheetrock instead of cocaine to customers," and "informed the customers when they had been 'ripped off' by a street seller who sold sheetrock"), *and Rainey v. State*, 877 S.W.2d 48, 51-52 (Tex. App.—Tyler 1994, no pet.) (determining that evidence, including video surveillance over period of time in area known for drug trafficking, was sufficient where it captured several drug transactions, including two conducted by defendant, showed defendant and others acting as lookouts to protect one another from police, established that officers made several undercover drug purchases from members of alleged combination, and documented that many of purchases occurred in same area, involved same type of drug, had common wholesalers, and had common price established by group), *with Hart v. State*, 89 S.W.3d 61, 65-66 (Tex. Crim. App. 2002) (concluding that evidence was insufficient to support conviction where evidence showed that defendant helped plan single theft and participated in that theft but where no evidence was presented showing that defendant was

19

aware of ongoing theft ring), *and Munoz*, 29 S.W.3d at 210-11 (reversing conviction for engaging in organized criminal activity where evidence showed that "[s]everal individuals came together with the intent to consummate one particular illegal act and in the course of doing so, committed other crimes" and that "when the particular act was consummated, nothing suggested that they intended, desired, or agreed to continue working together").

For all of these reasons, we overrule Smith's first issue on appeal.

**Unanimity Instruction**

In his second issue on appeal, Smith asserts that the district court "committed jury charge error by failing to give a unanimity instruction as to each separate criminal incident alleged at trial and the separate actors, as set out in the indictment."

Appellate courts review claims regarding alleged jury-charge errors under a "two-pronged test," *see Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd), with the first prong being a determination regarding "whether error exists," *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Regarding whether there was error in the jury charge, the governing law in Texas requires that a jury verdict be unanimous in all criminal cases. *See* Tex. Code Crim. Proc. art. 36.29(a); *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). In other words, "the jury must be unanimous in finding every constituent element of the charged offense in all criminal cases." *Jourdan v. State*, 428 S.W.3d 86, 94 (Tex. Crim. App. 2014). In this context, unanimity "means that the jury must 'agree upon a single and discrete incident that would constitute the commission of the offense alleged.'" *Cosio*, 353 S.W.3d at 771 (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007)). Accordingly, "'the jury must be instructed

20

that it must unanimously agree on one incident of criminal conduct (or unit of prosecution), based on the evidence, that meets all of the essential elements of the single charged offense beyond a reasonable doubt.'" *Saenz v. State*, 451 S.W.3d 388, 390 (Tex. Crim. App. 2014) (quoting *Cosio*, 353 S.W.3d at 776).

Regarding when non-unanimity issues might arise, the court of criminal appeals has explained that there are "three variations that may result in non-unanimous verdicts as to a particular incident of criminal conduct that comprises the charged offense." *Cosio*, 353 S.W.3d at 771 (internal footnote omitted). Moreover, the court warned that "[n]on-unanimity may result in each of these situations when the jury charge fails to properly instruct the jury, based on the indicted offense(s) and specific evidence in the case, that its verdict must be unanimous." *Id.* When presenting his issue on appeal, Smith relies on the second set of circumstances identified by the court of criminal appeals in which it explained that "non-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions" and when "[e]ach of the multiple incidents individually establishes a different offense or unit of prosecution." *See id.* at 772 (internal footnote omitted). Accordingly, the court explained that "to ensure unanimity," the jury charge "would need to instruct the jury that its verdict must be unanimous as to a single offense or unit of prosecution among those presented." *Id.*

However, the need for jury unanimity "is not violated" if a jury charge allows the jury to chose "among various alternative manner and means of committing the same" offense as it is statutorily defined. *Jourdan*, 428 S.W.3d at 94. A "jury must unanimously agree about the occurrence of a single criminal offense, but they need not be unanimous about the specific manner

21

and means of how that offense was committed." *Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim.

App. 2011); *see Miranda v. State*, 391 S.W.3d 302, 310 (Tex. App.—Austin 2012, pet. ref'd)

(explaining that "[j]ury unanimity is required with respect to all essential elements of the offense at

issue; however, the jury need not unanimously agree on the specific method of committing a single

offense"). "'[M]anner or means' describes *how* the defendant committed the specific statutory criminal

act." *Ngo*, 175 S.W.3d at 745.

The relevant portions of the jury charge in this case provided as follows:

The elements of organized criminal activity by committing Unlawful Delivery, Dispensation, or Distribution of a Controlled Substance, namely: four grams or more but less than 200 grams of Methamphetamine are that—

1. The defendant, committed Unlawful Delivery, Dispensation, or Distribution of a Controlled Substance, namely: four grams or more but less than 200 grams of Methamphetamine, and

2. The defendant did this with the intent to establish, maintain, or participate in a combination or in the profits of a combination.

You must all agree on elements 1 and 2 listed above. If you all agree the state has proved, beyond a reasonable doubt, both of the two elements listed above, you must find the defendant "guilty" [of the charged offense] . . . and so indicate on the attached verdict form.

. . .

Now bearing in mind the foregoing instructions, if you believe beyond a reasonable doubt that [Smith] from on or about the 1st day of May, 2013 through on or about the 4th day of December, 2013, and pursuant to a common scheme or continuing course of conduct, in the County of Burnet and State of Texas, as charged in the indictment, did then and there with the intent to establish, maintain, or participate in a combination or in the profits of a combination, said combination consisting of the defendant and at least two of the following persons: Nebes Montemayor, Guillermo Reyna, Abel Cardoso, Jimmy Hardin, Amy Borseth, Glen Alexander, Timothy Blackard, Joy Perez, Elizabeth Burch, Christopher Castillo,

22

> Cheri Gibbs, Kimberly Weston, Gina Magdaleno, or Charles Davidson, who collaborated in carrying on the criminal activity, . . . you will find [Smith] guilty of the offense.

When asserting that the charge is erroneous, Smith points out that "numerous actors were" listed in the charge and argues that "[w]ithout any type of unanimity charge," the jury was allowed to reach a non-unanimous decision regarding which two individuals "acted in combination with" Smith. *Cf. Cosio*, 353 S.W.3d at 770, 774 (determining that there was error in jury charge where charge contained four felony counts, where evidence showed that there was more than one occasion of misconduct supporting each count, and where jury charges generally instructed jury at end of each charge that jury's verdict must be unanimous but did not specify that it had to be unanimous about which instance constituted commission of offense for each count and explaining that charge "allowed for the possibility that the jury rendered non-unanimous verdicts"); *Ngo*, 175 S.W.3d at 742 & n.5, 745, 749 (concluding that jury charge for offense of credit card abuse that specified in "'boilerplate' section" of charge dealing with jury-foreperson selection that jury must unanimously agree "upon a verdict" and allowed jury to convict if defendant stole card, received stolen card, or fraudulently presented card was erroneous because it did not inform jury that "it was required to reach a unanimous verdict concerning one specific criminal act" and, accordingly, could have misled jury "into believing that only its ultimate verdict of 'guilty' need be unanimous"); *Francis v. State*, 36 S.W.3d 121, 122, 125 (Tex. Crim. App. 2000) (op. on reh'g) (concluding there was jury-charge error allowing for non-unanimous conviction where defendant was charged with one count of indecency, where jury charge allowed conviction on finding that defendant touched breasts *or* genitals of victim, where State presented evidence of four acts occurring on different dates with

23

two acts involving improper touching of victim's breasts and two acts involving improper touching of victim's genitals, and where State "elected to pursue a conviction on two of the incidents, one involving the touching of the victim's breasts and one involving the touching of the victim's genitals" because "it is possible that six members of the jury convicted appellant on the breast-touching offense (while the other six believed he was innocent of the breast-touching) and six members convicted appellant on the genital-touching offense (while the other six believed he was innocent of the genital-touching)"). Moreover, Smith contends that the testimony regarding "a voluminous amount of calls, street slang, and drug users and sellers" as well as the large amount of transcripts of calls relied on during the trial could have allowed the jury to convict Smith without agreeing about "each individual incident." Accordingly, Smith asserts that "all of the counts in the instant case required a separate unanimity instruction for each 'single, specific, criminal act,' alleged for each count" and that the instructions should have informed the jury that it "must not find the defendant guilty of this count unless you all agree on which incident, or incidents occurred, if you believe that the incident or incidents occurred at all, beyond a reasonable doubt. If you so believe, you need not all agree on every incident alleged for this count, as long as there is one incident, on which all the jurors are unanimous as to whether this incident occurred."[6]

As an initial matter, we note that we must disagree with Smith's argument that the jury charge contained multiple counts pertaining to different offenses. Both the indictment and the

---

[6] In this issue, Smith repeats his arguments from the first issue asserting that the evidence shows that "if Smith is guilty of anything, he is guilty of purchasing meth for his own personal use." However, as set out in the first issue, sufficient evidence was presented to support the jury's determination that Smith committed the offense of unlawful "delivery, dispensation, or distribution" of methamphetamine.

jury charge listed only one offense for engaging in organized criminal activity. Similarly, we must also disagree with Smith's suggestion that there was no unanimity instruction in this case. Although the jury charge did not contain the word unanimous, *see Ngo*, 175 S.W.3d at 749 n.44 (noting that "[t]here is . . . nothing in the Texas Constitution, statutes, or case law that requires a jury charge to contain the explicit words 'unanimous' or 'unanimously'"), it did instruct the jury members, as set out above, that they must "all agree" that the two elements of the offense were met before finding Smith guilty and that they must "all agree" that the State proved both elements beyond a reasonable doubt, *see Curry v. State*, 222 S.W.3d 745, 753 (Tex. App.—Waco 2007, pet. ref'd) (noting that courts presume that jury followed general unanimity instruction). Moreover, unlike some of the cases relied on by Smith in which boilerplate unanimity instructions were included at the end of the charges separate from the paragraphs applying the governing law to the facts and were determined to be defective, *see, e.g.*, *Cosio*, 353 S.W.3d at 774; *Ngo*, 175 S.W.3d at 745, 749, the unanimity instruction here appeared in the section of the charge entitled "APPLICATION OF THE LAW TO THE FACTS" right after the elements of the offense in question were listed and immediately before the particular allegations from the indictment were set out.

In addition, although Smith correctly points out that several individuals were alleged to have been involved in the combination and to have performed various acts in furtherance of the combination, "the names of various coconspirators and the various overt acts alleged [are] alternate means of committing the offense." *Bogany*, 54 S.W.3d at 463; *see Garcia*, 46 S.W.3d at 327 (determining that "[t]he names of the various coconspirators and the various overt acts alleged in the indictment were, in effect, alternate means of committing the offense" and "that the identities

25

of the persons with whom [the defendants] conspired, and the overt acts actually committed pursuant to the agreements, were preliminary fact issues as to which jury unanimity need not be required"); *cf. O'Brien v. State*, 482 S.W.3d 593, 606 (Tex. App.—Houston [1st Dist.] 2015, pet. granted) (providing that "when an indictment for engaging in organized criminal activity alleges the commission of more than one overt act, jury unanimity is not required with regard to the overt act performed"); *Renteria v. State*, 199 S.W.3d 499, 508 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (concluding that jury unanimity was not required where indictment alleged single offense of organized criminal activity with two alternative means by listing two types of theft). Accordingly, "the jury may return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted." *Bogany*, 54 S.W.3d at 463; *see also Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (providing that "'there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict'" (quoting *Schad v. Arizona*, 501 U.S. 624, 632 (1991) (plurality opinion))); *cf. Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004) (explaining that "[t]he unanimity requirement is not violated by instructing the jury on alternate theories of committing the same offense, in contrast to instructing the jury on two separate offenses involving separate incidents").

For these reasons, we must conclude that the fact that the jury charge in this case did not require juror unanimity regarding the overt acts performed or the members of the combination did not render the charge erroneous. *See Bogany*, 54 S.W.3d at 463; *see also Garcia*, 46 S.W.3d at 328 (concluding that district court did not err by refusing requested jury instruction). Having determined that the jury charge did not contain an error as alleged by Smith, we need not evaluate

any potential harm stemming from the alleged error. *See Bogany*, 54 S.W.3d at 463; *see also Swearingen*, 270 S.W.3d at 808 (explaining that amount of harm needed for reversal for jury-charge error depends on whether complaint regarding "that error was preserved in the trial court"); *Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008) (stating that if no objection was made, reversal is warranted only if error resulted in "egregious harm").

Accordingly, we overrule Smith's second issue on appeal.

## CONCLUSION

Having overruled both of Smith's issues on appeal, we affirm the district court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   August 30, 2016

Publish